Orville Lynn MAJORS, Appellant
(Defendant),

v.

STATE of Indiana, Appellee (Plaintiff).

No. 11S00–0004–CR–239.

Supreme Court of Indiana.

Aug. 14, 2002.

Susan K. Carpenter, Public Defender of Indiana, Gregory L. Lewis, Deputy Public Defender, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, James B. Martin, Ellen H. Meilaender, Deputy Attorneys General, Indianapolis, IN, Attorneys for Appellee.

SHEPARD, Chief Justice.

A jury found nurse Orville Lynn Majors guilty of murdering six patients in his care. The trial court sentenced him to 360 years in prison.

In this direct appeal, Majors focuses on multiple claims of jury mismanagement and misconduct. We reject these claims and affirm the trial court.

## Facts and Procedural History

Majors worked as a licensed practical nurse at Vermillion County Hospital. In March 1995, an investigation began into a series of suspicious patient deaths at the Hospital. The investigation revealed that Majors was present at the sudden and unexpected deaths of seven patients, and that no one else was present at all seven. Investigators concluded that Majors killed these patients by injecting them with potassium chloride. The State charged Majors with seven counts of murder.

The trial was moved from Vermillion County and tried in Brazil by Judge Ernest Yelton of the Clay Circuit Court, with jurors from Miami County. The sequestered jury heard testimony for approximately six weeks and deliberated more than three days. It found Majors guilty on six counts and deadlocked on the seventh, resulting in a mistrial on that count. The court sentenced Majors to consecutive terms of sixty years for each conviction, for an aggregate term of 360 years.

After the trial, based on the affidavit of one juror, Majors filed a motion to correct error, which the trial court denied.

## I. The Judge's Caution to a Juror

■ Near the end of the trial, Judge Yelton became aware that a juror was making inappropriate facial expressions. He instructed a bailiff to privately caution the juror to be more circumspect. Neither the recipient nor other jurors whom she consulted knew who asked the judge to send this message. Neither party may have been aware of either the concern or the message. After the verdict the juror stated in an affidavit that the message frightened and upset her.

■ Majors says this was an improper and prejudicial ex parte communication, requiring reversal. We think the U.S. Supreme Court's analysis of such claims is helpful:

"[T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror. . . .

. . . [A] defendant has a due process right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the ful[l]ness of his opportunity to defend against the charge. . . . [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'"

*United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (citations omitted). A presumption of harm arises only when ex parte communications with jurors relate to a substantive right of the defendant. *Bruce v. State*, 268 Ind. 180, 227, 375 N.E.2d 1042, 1068 (1978).

■ This relatively innocuous message in no way impaired Majors' ability to defend himself against the charges. Furthermore, "[c]ontrol and management of the jury is an area generally committed to the trial court's discretion." *Norton v. State*, 273 Ind. 635, 661, 408 N.E.2d 514, 531 (1980) (citation omitted). We find no error here.[1]

---

1. As to the juror's statements concerning how this message upset her, we recently adopted the federal approach and will consider juror affidavits to the extent that they assert that deliberations were tainted by improper information or influence. *Griffin v. State*, 754 N.E.2d 899, 902–03 (Ind.2001). We disregard statements about the effect of that information or influence on the juror's decision, however, and instead make an independent

## II. The Jurors' After–Hours Activities

 To warrant a new trial based on juror misconduct, the defendant must show the misconduct was gross and probably harmed him. *Griffin v. State*, 754 N.E.2d at 901 (citing *Lopez v. State*, 527 N.E.2d 1119 (Ind.1988)). This determination lies within the trial court's discretion. *Id.* Only when the decision is clearly against the logic and effect of the facts and circumstances will this Court find an abuse of discretion.[2] *Hall v. State*, 760 N.E.2d 688, 689–90 (Ind.Ct.App.2002).

 *A. The Two Beers.* Majors requests a new trial because one juror ordered and drank two beers that a bailiff delivered to the juror's hotel room on the evening after the third day of deliberations. (R. at 2848.) This juror saw bailiffs "running up and down the hall filling orders" at other jurors' doors and assumed that other jurors drank alcohol also.[3] (R. at 2849.)

Majors cites *Schultz v. Valle*, 464 N.E.2d 354 (Ind.Ct.App.1984), where the Indiana Court of Appeals held a verdict per se invalid because jurors drank alcohol during deliberations. *Schultz*, however, presented quite a different scene. There, some jurors consumed as many as three beers each during an hour-and-a-half dinner break, then resumed deliberations. *Id.* at 355. Here, the jury had adjourned for the day and did not resume deliberations until 8:00 the next morning. (R. at 3237.)

While allowing jurors to consume alcohol during deliberations would certainly be ill-advised, the question is not whether alcohol touched any juror's lips during the entire time between the judge's charge to the jury and the jury's rendering of verdicts. Rather, the focus is whether the jury was free from the influence during actual deliberations. A full night passed after this juror drank her two beers, and Majors does not claim that she or any other juror showed any effects related to alcohol consumption when deliberations resumed the next morning. He has there-

---

determination of the likely effect of the prejudicial material, with the goal of avoiding post-verdict volleys of juror affidavits that purport to re-create individual thought processes. *Id.*

Here (assuming for the sake of argument that this message qualified as an outside influence), a discreet request that a juror not betray her reactions so openly, which was not attributed to either the State or defense, did not prejudice Majors.

2. Majors concludes several of his arguments with the general assertion that he was denied his constitutional right to a fair trial by an impartial jury. Although he cites to U.S. Constitution amendments, he provides no cogent argument as to how these rights were violated and has thus waived these claims under Ind. Appellate Rule 46(A)(8).

3. There is reason for skepticism about this juror's credibility. On December 14, 1999, she swore under penalty of perjury that "I know that the wife of our foreman … is writing a book about the trial." (R. at 2850,

2854.) She also swore that after the trial she received a formal invitation saying "that [the foreman's wife] was writing a book about the case and that I was invited to attend a gathering of the jurors to discuss the case." (R. at 2851.) On February 1, 2000, she conceded in a supplemental affidavit, "My impression based on the comments being made by the other jurors was that [the foreman's wife] was writing a book about the case. Whether a book will actually be written or not, I do not know." (R. at 3169.) She also acknowledged, "I did not read the invitation … very closely before I threw it in the trash. I assumed the invitation was directed toward the writing of the book…." (R. at 3169.)

We note also that the State obtained affidavits from all eleven other jurors, none of whom confirmed that any jurors drank alcohol during deliberations and most of whom positively said that they saw no drinking. (R. at 2941, 2947, 2953, 2955, 2957, 2959, 2961, 2963, 2965.) One juror believed that all the other orders that evening were for soft drinks. (R. at 2965.)

fore not shown either gross misconduct or probable harm.

█ B. The Fishing Expeditions. Majors next claims that jurors were subtly influenced to favor the State due to their fraternization with law enforcement officers at two picnics hosted by the Clay County sheriff. When the trial began and the jury was sequestered for what looked to be a rather long haul, Judge Yelton told the jurors that they could request recreational activities. (R. at 3203, 3207.) During the second week of trial, they asked if they could go fishing some evening. (R. at 3209.)

A local podiatrist agreed to allow the use of his property, which was adjacent to that of Clay County's sheriff. (R. at 2856, 2859, 3209.) The sheriff was a veteran officer who was "well versed on appropriate juror exposure" and had no involvement in the Majors investigation or prosecution. (R. at 3210.) All the jurors along with the doctor, the sheriff and his wife and young son, several Indiana State Police officers, and two bailiffs participated in the outing, which was held the third week of trial. (R. at 2844, 2858, 2971.)

The officers and bailiffs transported the jurors to the picnic, provided security, and performed duties such as grilling food. (R. at 3211–12.) None of the officers at the cookout were involved with the investigation of Majors in any capacity. (R. at 3204, 3210, 3212.) The event was so well received that a similar picnic was held two weeks later.

One juror had disclosed during voir dire that her sixty-fifth birthday was approaching. Her birthday fell on the day of the first outing, and the judge arranged for delivery of a cake to honor the occasion.

At the end of the evening, the sheriff's wife gave this juror a bottle or two of white zinfandel wine that may have been left over from the party supplies.

Majors offers no support for his speculation that the jurors would favor testifying police officers because they were friendly with their security detail. Moreover, sequestered jurors whose activities are confined in the interests of a fair trial are necessarily placed under the care and custody of a court's bailiff and, where the length of a trial or other logistics necessitate, additional personnel such as law enforcement officers. If we were to view any small kindnesses as currying favor on behalf of the State, jurors' freedom would be even more restricted, which could easily produce a resentment that would benefit neither party.

█ Although friendships may have developed between the security officers and the jurors here, nothing in the record indicates that Majors suffered prejudice as a result of the two outings or the modest birthday gift.[4] The trial court did not abuse its discretion in finding that the jury's verdict was not influenced by these events.

█ C. Comments About the Attorneys. Majors next claims the jury improperly discussed aspects of the trial prior to deliberations. He offers a juror affidavit indicating that jurors made a few isolated comments during trial about physical characteristics of both State and defense attorneys, and about the way a defense attorney questioned witnesses. (R. at 2852.) He does not claim that the trial judge was aware of these alleged comments. (See Appellant's Br. at 58–62.)

---

4. Majors also complains that after the verdict, one of the state troopers gave Indiana State Police keychains to the jurors. (Appellant's Br. at 55.) This is irrelevant. In light of the timing, it could not have influenced the verdict.

This constitutes an attempt to impeach the verdict, impermissible under Ind. Evidence Rule 606(b).[5]

*Conclusion.* The trial court did not abuse its discretion by rejecting Majors' claims of juror misconduct.

## III. The Request to Depose Jurors

 Majors next asks that we remand his case and order depositions of the jurors, the alternates, and the bailiffs. He claims the right to explore further his allegations of juror misconduct by deposing jurors who spoke to the State after the trial but chose not to speak with defense counsel. He cites the principle that absent a showing of no legitimate defense interest or of a paramount State's interest, a criminal defendant has the right to depose State witnesses. *Murphy v. State,* 265 Ind. 116, 352 N.E.2d 479 (1976).

 Juror depositions are a very different matter, however, from witness depositions. We recently emphasized the public interest in discouraging post-trial verdict impeachment via affidavit:

> ... [Post-verdict] juror affidavits could defeat the jury's solemn acts under oath, open the door to post-trial jury tampering, and allow dissatisfied jurors to destroy a verdict after assenting.

Moreover, if impeachment were allowed, "[t]he sanctity of verdicts would [ ] be diminished and no verdict could ever be final. Jurymen would forever be harassed." For these reasons we have historically been reluctant to open the door to a "contest of affidavits and counter-affidavits and arguments and re-arguments as to why and how a certain verdict was reached. Such an unsettled state of affairs would be a disservice to the parties litigant and an unconscionable burden upon citizens who serve on juries."

*Griffin,* 754 N.E.2d at 902 (citing, *inter alia, Taylor v. Garnett,* 110 Ind. 287, 11 N.E. 309 (1887)). The same concerns apply to post-verdict juror depositions.

The federal courts take a similar position. *See McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 59 L.Ed. 1300 (1915) (denying defendant's request for post-verdict discovery); *United States v. Riley,* 544 F.2d 237, 242 (5th Cir.1976) ("Historically, interrogations of jurors have not been favored by federal courts except where there is some showing of illegal or prejudicial intrusion into the jury process.").

Majors seeks to corroborate allegations by one juror whose credibility, as we noted above, is dubious.[6] In response to these

---

5. Rule 606(b) says:

 *Inquiry into Validity of Verdict or Indictment.* Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify (1) to drug or alcohol use by any juror, (2) on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or (3) wheth-

er any outside influence was improperly brought to bear upon any juror. A juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying may not be received for these purposes.

6. Majors also later submitted affidavits from two alternate jurors, (R. at 3175–81), but these do nothing to advance his cause. Neither provides any evidence of juror alcohol consumption during deliberations. (*Id.*) Their statements concerning the message, the picnics, and the gift of wine are irrelevant, as explained above, because these activities were not prejudicial.

allegations, the State obtained affidavits from all eleven other jurors and three alternates. None offered any evidence of alcohol consumption during deliberations, improper prejudicial information, or outside influence, which are the only subjects to which jurors may testify under Evid. R. 606(b), and many denied any such activity.

In sum, Majors has not demonstrated a defense interest sufficient to overcome the interests of finality of verdicts and avoidance of juror harassment. The trial court did not err in denying the request for depositions.

## IV. The Witness's Polygraph

 During the investigation, police interviewed Majors' former roommate, Andrew Harris. During Harris' cross-examination, defense counsel elicited the fact that Harris had secured an immunity agreement. With the court's permission, the State then rehabilitated Harris on redirect with testimony that the immunity agreement was a prerequisite to Harris' agreement to submit to a polygraph exam that ultimately indicated that he spoke truthfully in denying that he aided or assisted in any unnatural deaths at the Hospital. Majors' attorney objected to the testimony.[7]

 Admission of polygraph evidence, including the mere fact of a polygraph examination, generally requires a stipulation by both parties. *See Albrecht*

*v. State,* 737 N.E.2d 719, 725 (Ind.2000), *reh'g denied; Swan v. State,* 462 N.E.2d 68, 71 (Ind.1984) (mention that witness has taken polygraph examination not permitted absent some form of waiver). We discourage the admission of polygraph evidence because of the procedure's unreliability combined with its likelihood of unduly influencing a jury's decision. *Smith v. State,* 547 N.E.2d 817, 820 (Ind.1989); *see also Ben–Yisrayl v. State,* 753 N.E.2d 649, 653 (Ind.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002).

 In some narrow circumstances, however, a party may open the door to admission of polygraph evidence. *See, e.g., Willoughby v. State,* 552 N.E.2d 462, 469 (Ind.1990) (defendant who misleads jury as to his truthfulness by referring to polygraph examination opens door to admission of results); *see also United States v. Lynn,* 856 F.2d 430, 433 (1st Cir.1988) (polygraph results admissible for reasons other than proving truth of assertions made during examination).

Here, after the defense elicited Harris' testimony about his immunity agreement, the State sought to rebut the logical inference that Harris was somehow implicated in the crimes. The State could only do this by demonstrating that the immunity was a prerequisite to a polygraph exam and that the exam result was consistent with Harris's denial of personal involve-

---

7. This objection occurred after both the reference to the polygraph and Harris's testimony that the test verified his assertion that he had not aided or assisted in the deaths. The State argues that the objection came too late and the issue was therefore waived for appeal, quoting *Lay v. State,* 659 N.E.2d 1005, 1013 (Ind.1995) (defendant "must object or move for mistrial at the first mention of a polygraph examination"). (Appellee's Br. at 41 n. 4.)

Where, as here, the challenged ruling arises from a recorded bench conference held im-

mediately before the polygraph testimony, it would be an overly mechanistic application of this rule to require a repetitious objection in the jury's presence. Here, however, the defense did not challenge the admissibility of the polygraph evidence during the bench conference, but rather sought to avoid its admission by offering to withdraw the question about the immunity agreement. The State is therefore correct that we could deem this issue waived for appeal.

ment in the crimes.[8]

Under somewhat different circumstances, the First Circuit concluded in *Lynn* that evidence that a key prosecution witness submitted to a polygraph as a condition of his plea agreement was admissible, as was the fact that some of his answers were "inconclusive." *Id.* at 432–33. We need not embrace this holding to conclude that once the defense had taken out after the witness for testifying under a grant of immunity, the trial court had the discretion to permit the jury to understand the circumstances of that immunity.

 Moreover, even if this case did not fall within an exception to the general rule, the admission of polygraph evidence is subject to harmless error analysis. *See Austin v. State*, 262 Ind. 529, 533, 319 N.E.2d 130, 133 (1974), *cert. denied*, 421 U.S. 1012, 95 S.Ct. 2417, 44 L.Ed.2d 680 (1975); *United States v. Whitt*, 718 F.2d 1494, 1502 (10th Cir.1983). The probable impact of the polygraph reference upon the verdict is of prime importance. *Reese v. State*, 452 N.E.2d 936, 940 (Ind.1983).

Here, the probable impact of the polygraph reference was minimal. Harris testified that Majors often commented that the elderly "should be gassed," (R. at 6108), but another witness provided more damaging testimony that Majors admitted that he killed patients at the hospital using potassium chloride, (R. at 8732). Harris also testified that he saw a vial of potassium chloride in the garage he shared with Majors and one in Majors' car, (R. at 6100–01), but other witnesses confirmed that the police found such bottles during a search of Majors' residence and of a van he drove, (R. at 4585–87, 4600–02, 4694–710, 4741–48, 5740–56, 6094). The most

damning evidence against Majors came from medical staff, experts, and victims' family members, who together established that six victims died unnatural deaths due to potassium chloride poisoning and that Majors was the only common denominator.

Viewing the evidence as a whole, the polygraph evidence likely had little effect on the jury and any error in its admission was harmless.

### V. Cumulative Error

Majors argues that even if the individual errors he claims were not sufficiently prejudicial standing alone to vacate the verdicts, the cumulative effect of all errors deprived him of his right to a fair trial before an impartial jury. Because we have found no errors, cumulative effect analysis is inapplicable.

### Conclusion

We affirm the judgment of the trial court.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.

---

8. Majors argues that the State first impeached Harris on direct, by asking where one of the interviews took place, to which Harris answered that the meeting was at his attorney's office. (R. at 6098–99.) Because we find in the alternative that the polygraph evidence was at worst harmless error, we need not address who opened the door to what.