
FILED
Jun 30 2015, 9:53 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Lawrence D. Newman
Newman & Newman, P.C.
Noblesville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Daniel P. Wahl,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

June 30, 2015

Court of Appeals Cause No.
29A02-1409-CR-625

Appeal from the Hamilton Superior
Court.

The Honorable Gail Z. Bardach,
Judge.

Cause No. 29D06-1309-FD-7823

**Riley, Judge**

## STATEMENT OF THE CASE

[1] Appellant-Defendant, Daniel Wahl (Wahl), appeals his conviction for involuntary manslaughter, a Class D felony, Ind. Code § 35-42-1-4 (2013).

[2] We affirm.

## ISSUES

[3] Wahl raises four issues on appeal which we restate as:

(1) Whether the State presented sufficient evidence to sustain Wahl's involuntary manslaughter conviction;

(2) Whether the trial court abused its discretion in denying Wahl's motion to correct error regarding jury misconduct;

(3) Whether Wahl's sentence is appropriate; and

(4) Whether the trial court abused its discretion by ordering Wahl to pay restitution.

## FACTS AND PROCEDURAL HISTORY

[4] In the spring of 2011, Danny (Danny) and Jocelyne DiRienzo (collectively, the DiRienzos) began searching for a daycare for their minor children, D.D., and A.D. The DiRienzos were referred to Wahl and his wife, Saundra (collectively, the Wahls), who ran a State-licensed daycare facility out of their home basement in Fishers, Indiana. After touring the daycare facility, the DiRienzos selected the Wahls to provide child care services to both of their children.

[5] In 2003, the Wahls built their home with the primary intention of operating a daycare facility from their basement. Shortly thereafter, the Wahls were licensed, and for ten years, they operated a daycare business under the name "Home Away from Home Child Care." In establishing their roles as child care providers, the Wahls determined that Saundra would be responsible for toddlers ranging from five months to two years, while Wahl would be responsible for the older children.

[6] In June of 2013, A.D. was a healthy, twenty-month-old toddler. On June 20, 2013, as usual for their day, Wahl had taken the older children to the backyard to eat and play. While Wahl was outside with the older children, Saundra remained inside with the toddlers for feeding. Because the older children were outside, Saundra removed a compression gate between the kitchen area and the toddlers' sleeping area in the basement to allow the small children to move and play freely between the two rooms. In addition, Saundra also placed a child in the highchair in the kitchen for feeding and walked back to the kitchen sink to warm bottles.

[7] The record shows that in addition to the compression gate that divided the toddlers' sleeping area and a play area adjoining the kitchen, there was a white metal security gate placed in the basement hallway. The white metal security gate was positioned so as to prevent the children from accessing the stairway

leading to the first floor.[1]  As Saundra was standing in the kitchen, she heard the white metal security gate being "jingled."  (Transcript p. 405). Immediately, Saundra walked over to inspect.  There, she found A.D. and another child playing with the gate.  Saundra removed and placed both children across the room, admonished them, and returned to the kitchen to retrieve the child she had left in the highchair, and to grab a bottle.

[8]  From the kitchen, only a portion of the white metal security gate was visible. As Saundra was lifting the child from the highchair, she saw the child that A.D. had been playing with had passed the white metal security gate.  Saundra immediately placed the baby she was carrying on the floor and rushed towards the gate.  Like the other toddler, A.D. had breached the gate; however, as A.D. was returning to the play area adjoining the kitchen, his head became trapped between the latch end of the gate and the wall.  At first, Saundra thought A.D. was okay since his eyes were open.  Saundra freed A.D. from the white metal security gate, and noticed that A.D. was unresponsive and not breathing.

---

[1] The Wahls had placed several security gates in their home.  From what we can decipher from the record, there were about four security gates.  On the first floor, there was a white metal gate closing off the stairway leading to the second floor.  In the basement hallway, there was a similar white metal security gate—at issue in this cause—closing off the stairway leading to the first floor.  In addition, there was a long plastic compression gate dividing a large room in the basement into two sections.  Lastly, there was a small plastic compression gate diving the toddlers' sleeping area and the kitchen area.

Promptly, Saundra began performing CPR on A.D. As she was doing that, she saw two older children who had been out in the yard, and she requested them to call Wahl. The children did not comprehend, so Saundra momentarily left A.D. on the floor, rushed to the base of the stairway, and yelled for assistance. Moments later, Wahl re-entered the basement, intercepted the CPR process and asked Saundra to call 911. Within minutes, the Fishers Police Department arrived followed by the paramedics. A.D. was then transported to Community North Hospital, where he was pronounced dead at 12:59 p.m. The following day, the autopsy showed that A.D. had died from asphyxiation.

[9] On September 19, 2013, the State filed an Information charging the Wahls[2] with involuntary manslaughter, a Class D felony, I.C. § 35-42-1-4 (2013). At trial, Detective James Hawkins (Detective Hawkins), a criminal forensic investigator testified that after he received a call from another officer, he immediately drove to the Wahls' residence to investigate. He stated that the white metal security gate situated in the Wahls' basement hallway had been anchored on the west wall. On the east wall, there were two independent anchors with latches for the gate to lock into. The security gate had been installed in 2003 and was maintained by Wahl. Detective Hawkins noted that

---

[2] Saundra appeals separately.

the "top anchor" on the west wall appeared as if it had "been ripped out and then re-anchored back in." (Tr. p. 335). On the east wall, he noted that there were a "bunch of wear marks at the receiving end of the top latch" and applying minor pressure "like a tap" would cause the gate to open. (Tr. p. 338). According to Detective Hawkins, the white metal security gate would not come into contact with the latches, and it caused the gate to swing north and south while open. He further testified that he learned from Wahl that there was a "wooden rocking chair [] on the north side of the gate," and a baby rocking swing on the south end. (Tr. p. 379). He added that both had been used to "keep the gate from moving when [the Wahls] wanted it shut." (Tr. p. 379). The wooden rocking chair had "a lot of wear marks on the [] vertical rail directly adjacent to where" it would "make contact with the baby gate." (Tr. p. 381).

[10] Danny described his son as a healthy and happy baby. He testified that "approximately a month and a half to two months" prior to A.D.'s death, he was in the Wahls' home either to drop off or pick up his children. (Tr. p. 263). Danny recalled that Saundra discussed A.D.'s progress with him, and he recalled Saundra stating that A.D. "can even push his way through the baby gate downstairs." (Tr. p. 263).

[11] The forensic pathologist who conducted A.D.'s autopsy stated that while there are many variables that are considered in determining how long it takes to asphyxiate, for small children, he indicated that it may take "approximately 90 seconds to 120 seconds" for asphyxiation to ensue; and it would take "no more

than 5 minutes" for a child to die. (Tr. p. 437). At the close of the evidence, the jury found the Wahls guilty as charged.

[12] Prior to sentencing, but after the jury returned a guilty verdict for the Wahls, the trial court received an email from Juror #7, which stated in part:

> At the start of deliberation the alternate juror started to take over deliberation and at that point, I interjected and went to the part in our paperwork that stated the alternate juror was not to have any part in the deliberation. From that point I felt like there was tension in the room between the other jurors. The reason that I feel that the alternate juror influenced the other jurors is because he took items out of the envelope and took the parts to the gate and operated the gate. I had emphasized to the other jurors that what we were dealing with was a very serious charge. I asked the other jurors if they had ever been incarcerated before. I told the jurors that I had been incarcerated and it is a life changing experience. After saying this, the alternate juror let out a big sigh, rolled his eyes and shook his head as if he was disgusted. Also, at one point, the alternate juror stood up and went to the [DVD] player. When he was asked what he was doing, he said he wanted to see a particular part in the video. He repeatedly played it over and over and increased the volume each time until everyone was watching it.

(Court's Exh. 1). On June 6, 2014, the trial court scheduled a hearing to determine the alleged jury misconduct. At the hearing, the Wahls moved for a mistrial and after both parties had presented their arguments, the trial court took the matter under advisement. On June 11, 2014, the trial court denied the motion. Following a sentencing hearing held on June 30, 2014, the trial court sentenced the Wahls to 1095 days in the Department of Correction (DOC) with 730 days executed and placed them both on probation for 365 days. In addition, the trial court ordered the Wahls to jointly and severally pay the

DiRenzos $22,353.72 in restitution, with $20,232.52 of that amount being Danny's lost wages. In light of the jury misconduct, on July 29, 2014, the Wahls, through their appellate counsel, filed a motion to correct error and attached an affidavit from Juror #7 requesting the trial court to grant them a mistrial or, in the alternative, grant them a hearing to present evidence from Juror #7. Consequently, the State responded to the Wahls' motion on August 5, 2014, and on August 18, 2014, the trial court denied the Wahls' motion.

[13] Wahl now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Sufficiency of the Evidence*

[14] Wahl first argues that the evidence is insufficient to sustain his conviction. When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id*. We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id*.

[15] The version of Indiana Code Section 35-42-1-4(e) in effect at the time Wahl committed his crime provided that if: (1) a child care provider recklessly supervises a child; and (2) the child dies as a result of the child care provider's reckless supervision; the child care provider commits class D felony involuntary

manslaughter. Conduct is reckless if the person engaged in that conduct "in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." I.C. § 35-41-2-2(c). As charged, to convict Wahl of involuntary manslaughter, the State was required to prove that Wahl recklessly supervised A.D. and that A.D. died as a result thereof.

[16] Here, the uncontested evidence presented at the Wahls' joint trial was that Saundra was first alarmed by A.D.'s and the other child's presence by the security gate when she heard it jingle. Saundra testified that she walked over to the security gate, scolded the children for playing with the security gate, and consequently removed them and placed them across the room. Shortly thereafter, Saundra returned to the kitchen to grab a bottle and pick up the baby she had left in the highchair. Unbeknownst to Saundra, A.D. and the other baby had ventured back to the security gate. Moments later, Saundra returned to the gate area only to find that the security gate had been released from its latch, A.D. and the other baby were on the opposite end, and A.D. was wedged between the gate's latch and the wall. After Saundra had freed A.D. from the gate, she called for help. Shortly thereafter, Wahl rushed to the basement to aid Saundra. Wahl performed CPR on A.D. and directed Saundra to call 911.

[17] In arguing that the evidence is insufficient to sustain his involuntary manslaughter conviction, Wahl attempts to detach himself from the events of June 20, 2013, by solely passing the blame onto Saundra. Wahl distances himself from A.D.'s death by arguing that "he was not in the basement" on that

day. (Appellant's Br. p. 16). He further argues that he "reasonably believed that Saundra was providing" adequate "supervision to the children" given her twenty-five years of experience as a child care provider. (Appellant's Br. p. 16). We find that Wahl's argument falls short for the following reason: Even though the Wahls settled that Wahl would be responsible of the older children while Saundra would care for the toddlers, and he was not present when A.D. became lodged in the gate, at all times, he was licensed to operate the daycare at his home in Fishers, Indiana. As such, Wahl's attempt to distance himself from A.D.'s death must fail since he had a legal duty as a licensed child care provider to also care for the toddlers in his home. Also, we find that Wahl is not entirely free from blame since he installed and maintained the security gate that trapped A.D.

[18]　In proving its case against Wahl, the State offered evidence that Wahl was aware that the gate did not function properly and had placed furniture on both sides of the gate to prevent the children from opening the gate. To rebut the State's claim, Wahl submitted Exhibit H—a video showing a yet similar white metal security gate situated in the first floor of their residence. Wahl testified that the gate was similar to the gate in the basement, and the short video shows him locking the gate and jingling the gate. Our review of Wahl's Exhibit H conveys to us that when the gate was locked, it was sturdy and was impossible for a child to breach it. While the gate in the video might have been identical, the record reveals that the gate in the basement did not clasp properly into its fasteners.

[19] As detailed above, Wahl installed and maintained the white metal security gate. The record unveils that the gate was not in a pristine condition, and most importantly, it malfunctioned. At trial, Detective Hawkins stated that the "top anchor" on the west wall appeared as if it had "been ripped out and then re-anchored back in." (Tr. p. 335). On the east wall, he noted that there were a "bunch of wear marks at the receiving end of the top latch." (Tr. p. 338). In addition, Detective Hawkins pointed out that the gate did not lock into place, and it took insignificant effort to thrust it open. At trial, Wahl lacked an explanation about why the white metal security gate became unlatched on the day A.D. died.

[20] Lastly, Wahl argues that he was unaware that Saundra had mentioned to Danny approximately two months before A.D.'s death that A.D. could push his way through one security gate in the basement. Wahl maintains that because he was unaware that A.D. had become increasingly stronger, and could breach the security gate in the basement, it disproves the State's case against him. We note that the Wahls were partners and worked as equals in their home daycare. Wahl's claim that he was unaware about A.D.'s progress is nothing but an invitation for this court to reweigh the evidence, which we will not do. *See Bailey*, 907 N.E.2d at 1005.

[21] In as much as Wahl presented evidence that the gate in the basement was secure when it locked, and that it operated similarly to the one on their first floor, this evidence does not alter the fact that A.D. and the other child were able to unlatch the gate on June 20, 2013. We note that the purpose of having a

baby gate is to ensure that children do not wander off to unsupervised areas. We agree with the State's assertion that failure to maintain a properly functioning gate knowing that there would be small children in the house capable of pushing through the gate, is certainly an act committed in "plain, conscious, and unjustifiable disregard" of the harm that might result, and is indeed a "substantial deviation from acceptable standards of conduct." I.C. § 35-41-2-2(c). In light of the foregoing, we find that there was sufficient evidence to convict Wahl of involuntary manslaughter.

## II. *Motion to Correct Error.*

[22] Next, Wahl argues that the trial court abused its discretion by denying his motion to correct error based on alleged jury misconduct. In general, a trial court has broad discretion to determine whether to grant or deny a motion to correct error. *Volunteers of Am. v. Premier Auto Acceptance Corp.*, 755 N.E.2d 656, 658 (Ind. Ct. App. 2001). We will reverse only for an abuse of that discretion. *Id*. An abuse of discretion occurs if the trial court's decision was against the logic and effect of the facts and circumstances before the court or if the court misapplied the law. *Id*. The trial court's decision comes to us cloaked in a presumption of correctness, and the appellant has the burden of proving that the trial court abused its discretion. *Id*. In making our determination, we may neither reweigh the evidence nor judge the credibility of witnesses. *Id*. Instead, we look at the record to determine if: (a) the trial court abused its judicial discretion; (b) a flagrant injustice has been done to the appellant; or (c) a very

strong case for relief from the trial court's [order] . . . has been made by the appellant. *Id*.

[23] Wahl maintains that the interference by the alternate juror during jury deliberations constituted impermissible extra-judicial communication. As stated above, prior to sentencing and after the jury returned a guilty verdict for the Wahls, the trial court received an email from Juror #7, who indicated that the alternate involved himself in the jury deliberations. A hearing was conducted on June 6, 2014, and the Wahls moved for a mistrial. Subsequently, on June 11, 2014, the trial court denied the Wahls' motion and stated in part:

> There is no evidence of extrajudicial jury taint because the alternate juror's misconduct was in his unspoken handling of the items properly admitted into evidence, properly in the jury room during deliberations and properly able to be considered by the jury. Even if his actions may be considered to be extrajudicial, they were harmless . . .

(Appellant's App. p. 91). Shortly after sentencing, the Wahls filed a motion to correct error exclusively supported by Juror #7's affidavit reiterating the statements made in the prior email.

[24] The State maintains that when a defendant seeks a new trial based on jury misconduct, he must show that the misconduct was (1) gross, and (2) he was probably harmed. *See Griffin*, 754 N.E.2d at 901. We disagree that this is the correct standard of review. Most recently, our supreme court in *Ramirez v. State*, 7 N.E.3d 933, 938 (Ind. 2014), took into account the confusion involved when determining jury taint and sought to clarify the existing precedents. In

particular, the court stated: "[F]ederal and Indiana precedent has narrowed the presumption of prejudice to apply in cases where defendants show more than just potential taint—but some Indiana precedent, including our own, has applied that presumption inconsistently. We now clarify its precise scope, and reiterate the proper process for trial courts to address jury taint in the courtroom." *Id*. at 935. In clarifying the law regarding the various standards courts should apply on suspected jury taint, it stated:

> Defendants seeking a mistrial for suspected jury taint are entitled to the presumption of prejudice only after making two showings, by a preponderance of the evidence: (1) extra-judicial contact or communications between jurors and unauthorized persons occurred, and (2) the contact or communications pertained to the matter before the jury. The burden then shifts to the State to rebut this presumption of prejudice by showing that any contact or communications were harmless. If the State does not rebut the presumption, the trial court must grant a new trial. On the other hand, if a defendant fails to make the initial two-part showing, the presumption does not apply. Instead, the trial court must apply the probable harm standard for juror misconduct, granting a new trial only if the misconduct is "gross and probably harmed" the defendant. *Henri v. Curto*, 908 N.E.2d 196, 202 (Ind. 2009) (internal quotation marks omitted). But in egregious cases where juror conduct fundamentally compromises the appearance of juror neutrality, trial courts should skip [the] two-part inquiry, find irrebuttable prejudice, and immediately declare a mistrial. At all times, trial courts have discretion to decide whether a defendant has satisfied the initial two-part showing necessary to obtain the presumption of prejudice or a finding of irrebuttable prejudice.

*Id*. at 939. (certain internal citations omitted). According to the test proponed in *Ramirez*, Wahl is required to show by a preponderance of the evidence that: (1) the alternate juror communicated with jurors without authorization; and (2)

about the matter before the jury. We will first establish whether Wahl has met his initial two-part inquiry of prejudice.

## A. *Prejudice*

[25] It is a long-established principle in Indiana jurisprudence that a jury's verdict may not be later impeached by the jurors who returned it. *Ward v. St. Mary Med. Ctr. of Gary*, 658 N.E.2d 893, 894 (Ind. 1995). The policy reasons for this are that "(1) there would be no reasonable end to litigation, (2) jurors would be harassed by both sides of litigation, and (3) an unsettled state of affairs would result." *Id*. This principle is also set forth in Indiana Evidence Rule 606(b) which provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify (1) to drug or alcohol use by any juror, (2) on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or (3) whether any outside influence was improperly brought to bear upon any juror.

A rebuttable presumption of prejudice will arise if jurors engage in misconduct by out-of-court communications with unauthorized persons. *Spears v. State*, 811 N.E.2d 485, 488 (Ind. Ct. App. 2004). In *Griffin*, our supreme court explained that an alternate juror is not a member of the jury, "and he or she qualifies as an outside influence under Rule 606(b)." *Griffin*, 754 N.E.2d at 903. Lastly, we

note that when evaluating jury misconduct, we consider juror affidavits to the extent they assert the deliberations were tainted by improper influence. *Majors v. State*, 773 N.E.2d 231, 234 n. 1 (Ind. 2002).

[26]    Here, the jury was instructed that the "alternate will be with you in the room but is not permitted in your deliberations or verdict." (Appellant's App. p. 66). According to Juror #7's affidavit, after the jury retired to the jury room and contrary to the trial court's instructions, the alternate began leading the jury in the discussions. After been asked to withdraw, he proceeded to test and experiment with the white metal security gate while discussions were ongoing. In addition, the alternate juror repeatedly replayed a video which led the jurors to interrupt their discussions and watch a particular portion of the video. From the foregoing, it is clear that the alleged communication—both spoken and unspoken—constituted impermissible communication barred under Rule 606(b), and it related to a matter before the jury. Having established that Wahl met his burden pursuant to *Ramirez*, the burden shifts to the State to show that the alternate juror's out-of-court communication was harmless.

B. *Whether the Out-of-Court Communication by the Alternate Juror was Harmless*

[27]    The State maintains that it rebutted the presumption of prejudice since the evidence of the alleged misconduct amounts to "harmless childish behavior." (Appellee's Br. p. 16). Specifically, the State argues that according to Juror #7's affidavit, that once it was pointed out to the alternate juror that he was not to participate in the deliberations, he abstained from further discussions. In

addition, the State argues that the most the alternate juror allegedly did was manipulate properly admitted evidence in the presence of the other juror, and as such, the State argues that this fails the 'outside influence' test.

[28] We note that the test for harmless error is not whether there was substantial evidence of the defendant's guilt but whether the error contributed to the verdict. *Hall v. State*, 796 N.E.2d 388, 396–97 (Ind. Ct. App. 2003), *trans. denied*. As noted above, the jury was admonished before retiring and they were well aware that the alternate juror was not to take part in the discussions. Also, the trial court gave an instruction reminding the jurors that their verdict must be based solely on the evidence presented at trial. We presume that the jury followed the trial court's instructions. *Harris v. State*, 824 N.E.2d 432, 440 (Ind. Ct. App. 2005). *See also Henriquez v. State*, 973 N.E.2d 1154 (Ind. Ct. App. 2012) (noting that juries tend to monitor themselves pretty well and that if the alternate is trying to deliberate, the other jurors would stop him or bring it to the court's attention) *trans. denied.*

[29] Here, Juror #7 advised the alternate juror to cease and desist from discussions, and we presume that the other jurors were attentive of that warning. Because we find that the jury was obviously aware that the alternate juror was not meant to take part in the discussions, any transient comments that the alternate juror made at the commencement of the jury deliberations or his curiosity to experiment with the exhibits admitted into evidence, did admit in any new material into the deliberations that was not already known by the jury from the trial itself. On these facts, it is clear to us that, while Wahl may have met his

initial burden, the State rebutted the alleged misconduct, and without more, we cannot say that the trial court erred in denying Wahl's motion to correct error.

### III. *Inappropriate Sentence*

[30] Next, Wahl argues that his sentence was inappropriate in light of the nature of the offense and his character. Indiana Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The burden is on the defendant to persuade the appellate court that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). "Ultimately the length of the aggregate sentence and how it is to be served are the issues that matter." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). Whether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other considerations that come to light in a given case. *Id*.

[31] The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Abbott v. State*, 961 N.E.2d 1016, 1019 (Ind. 2012). At the time of Wahl's sentencing, the advisory sentence for a Class D felony was one-and-one-half years, with a minimum of six months and a maximum of three years. Here, the trial court imposed the maximum sentence but suspended one year to probation. In arriving at this sentence, the

trial court found as mitigating circumstance the fact that Wahl had no criminal history at the time. However, the trial court found the nature of the offense and the fact that the victim was "less than 12 years of age" to be an aggravating circumstance. (Tr. p. 852). *See Kile v. State*, 729 N.E.2d 211, 214 (Ind. Ct. App. 2000) (holding that the trial court did not err in using the particularized factual circumstances of the case—namely the victim's age—as an aggravating factor).

[32] In challenging that his sentence is inappropriate as to the nature of the offense, Wahl regurgitates his sufficiency of the evidence arguments. Specifically, Wahl argues that the trial court should have taken into account that he was not present when A.D. became trapped in the gate, and he was unaware that Saundra had mentioned to Danny that A.D. could push his way through one security gate in the basement. Additionally, Wahl argues that the trial court should have considered the immediacy of his action to resuscitate A.D. when he re-entered the basement. Contrary to his assertions, the record reveals Wahl installed and maintained the gate that killed A.D., and he was conscious of that fact the gate did not latch properly.

[33] Turning to Wahl's character, at the time of his trial, Wahl was fifty-four years old and had led a law-abiding life. At his sentencing hearing, Wahl presented twenty-four letters from friends and families who attested to his impecable character. In as much as we find his character redeeming, it does not alter the seriousness of the charged offense. Wahl recklessly supervised A.D., and he died under his care. After due consideration of the evidence presented at trial, we cannot say that the sentence imposed by the trial court is inappropriate.

## IV. *Restitution*

[34] Finally, Wahl contends that the trial court abused its discretion in ordering that he jointly and severally pay $20,237.52 in restitution to the DiRenzos for Dannny's lost wages. At the sentencing hearing, Danny stated that he had missed a total of 53 days of work due to A.D.'s death. We reverse a trial court's order to pay restitution only for an abuse of discretion. *Gil v. State*, 988 N.E.2d 1231, 1234 (Ind. Ct. App. 2013). A trial court abuses its discretion if its "decision is clearly against the logic and effects of the facts and circumstances before it" or if it "misinterprets or misapplies the law." *Id.*

[35] Indiana Code section 35-50-5-3(a) provides, in relevant part, that "in addition to any sentence imposed under this article for a felony or misdemeanor, the court may . . . order the person to make restitution to the victim of the crime[.]" When such an order is entered, it must be based upon a consideration of:

> (1) property damages of the victim incurred as a result of the crime, based on the actual cost of repair (or replacement if repair is inappropriate);
> (2) medical and hospital costs incurred by the victim (before the date of sentencing) as a result of the crime;
> (3) the cost of medical laboratory tests to determine if the crime has caused the victim to contract a disease or other medical condition;
> (4) earnings lost by the victim (before the date of sentencing) as a result of the crime including earnings lost while the victim was hospitalized or participating in the investigation or trial of the crime; and
> (5) funeral, burial, or cremation costs incurred by the family or estate of a homicide victim as a result of the crime.

*Id.* An order of restitution is as much a part of a criminal sentence as a fine or other penalty. *Kotsopoulos v. State*, 654 N.E.2d 44, 46 (Ind. Ct. App. 1995). It is well established that the restitution order must reflect the actual loss sustained by the victim. *Smith v. State*, 471 N.E.2d 1245, 1248 (Ind. Ct. App. 1984), *trans. denied*. The amount of actual loss is a factual matter, which can be determined only upon presentation of evidence. *Id.* A restitution order must reflect a loss sustained by the victim as a direct and immediate result of the defendant's criminal acts, and the trial court may consider only expenses incurred by the victim prior to the date of sentencing. *Rich v. State*, 890 N.E.2d 44 (Ind. Ct. App. 2008), *trans. denied*.

[36] Here, Wahl argues that although Danny "presented documentation for his requested loss of wages" none of these explained why he missed work for a total of 53 days. (Appellant's Br. p. 29). In response, the State maintains that Wahl failed to lodge an objection to that number. After reviewing the transcript, we agree with the State that Wahl did not specifically object to the payment of Danny's loss of wages. Also, our review of the record reveals that Wahl did not lodge any objection at the sentencing hearing or at the trial court's consideration of the documents that Danny submitted for his loss of wages before the sentencing hearing.

[37] "Generally, failure to object to an award of restitution constitutes waiver of a challenge to the award on appeal, unless a defendant argues that the award was fundamentally erroneous and in excess of statutory authority." *Morris v. State*, 2 N.E.3d 7, 9 (Ind. Ct. App. 2013), *opinion on reh'g*. "[A] defendant's failure to

make a specific and timely objection to the trial court's receipt of evidence concerning the amount of restitution constitutes waiver of the issue on appeal." *Id*. Waiver notwithstanding, we recognize the vast weight of case law in this state indicates that appellate courts will review a trial court's restitution order even where the defendant did not object based on the rationale that "a restitution order is part of the sentence, and 'it is the duty of the appellate courts to bring illegal sentences into compliance.'" *Cherry v. State*, 772 N.E.2d 433, 440 (Ind. Ct. App. 2002) (quoting *Golden v. State*, 553 N.E.2d 1219, 1223–24 (Ind. Ct. App. 1990), *trans. denied*)).

[38] A.D. died on June 20, 2013, and Danny took time off work to grieve the loss of his son. According to the pre-sentence investigation report, Danny missed work from June 21 through August 30, 2013. He was also absent for two days from May 13-14, 2014, to attend the Wahls' trial. Lastly, Danny missed a day of work on June 12, 2014, to attend the sentencing hearing. At the sentencing hearing, Danny testified that even though he was compensated while on leave, given that he used up his leave days meant that he lost income of $ 20,237.52 which he would have netted upon retirement. Danny is a federal employee and has been for the past sixteen years. Under 5 U.S.C. § 5551(a), federal employees who are separated from service are entitled to receive a lump sum payment for the annual leave that they have accrued but not taken. We note that had Danny not been forced to expend his annual leave, he would have been entitled to a lump-sum cash payment for any unused leave in the event of

retirement as a federal employee pursuant to 5 U.S.C. § 5551. In light of the foregoing, the trial court properly ordered restitution for loss of wages.

## CONCLUSION

[39] Based on the foregoing, we conclude that (1) there was sufficient evidence to support Wahl's conviction for involuntary manslaughter; (2) the trial court did not abuse its discretion in denying Wahl's motion to correct error based on jury misconduct; (3) Wahl's sentence is appropriate; and (4) the trial court did not abuse its discretion in ordering restitution.

[40] Affirmed.

[41] Barnes, J. concurs

[42] Bailey, J. dissents with separate opinion

# IN THE
# COURT OF APPEALS OF INDIANA

Daniel P. Wahl,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

Court of Appeals Case No.
29A02-1409-CR-625

**Bailey, Judge, dissenting.**

[43] For the reasons expressed in my dissent in *Saundra Wahl v. State*, No. 29A04-1409-CR-418, I respectfully dissent.