

**FILED**

Jun 30 2015, 9:59 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Lawrence D. Newman
Newman & Newman, P.C.
Noblesville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Saundra S. Wahl,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

June 30, 2015

Court of Appeals Cause No.
29A04-1409-CR-418

Appeal from the Hamilton Superior
Court.

The Honorable Gail Z. Bardach,
Judge.

Cause No. 29D06-1309-FD-7824

**Riley, Judge**

## STATEMENT OF THE CASE

[1] Appellant-Defendant, Saundra Wahl (Wahl), appeals her conviction for involuntary manslaughter, a Class D felony, Ind. Code § 35-42-1-4 (2013).

[2] We affirm.

## ISSUES

[3] Wahl raises four issues on appeal which we restate as:

(1) Whether the State presented sufficient evidence to sustain Wahl's involuntary manslaughter conviction;

(2) Whether the trial court abused its discretion in denying Wahl's motion to correct error regarding jury misconduct;

(3) Whether Wahl's sentence is appropriate; and

(4) Whether the trial court abused its discretion by ordering Wahl to pay restitution.

## FACTS AND PROCEDURAL HISTORY

[4] In the spring of 2011, Danny (Danny) and Jocelyne DiRienzo (collectively, the DiRienzos) began searching for a daycare for their minor children, D.D., and A.D. The DiRienzos were referred to Wahl and her husband, Daniel Wahl (Daniel) (collectively, the Wahls) who ran a State-licensed daycare facility out of their home basement in Fishers, Indiana. After touring the daycare facility, the DiRienzos selected the Wahls to provide child care services to both of their children.

[5] Prior to June of 2013, Wahl had been working as a child care provider for approximately twenty-five years. In 2003, the Wahls built their home with the primary intention of operating a daycare facility from their basement. Shortly thereafter, the Wahls were licensed, and for ten years, they operated a daycare business under the name, Home Away from Home Child Care. In establishing their roles as child care providers, the Wahls determined that Wahl would be responsible for toddlers ranging from five months to two years, while Daniel would be responsible for the older children.

[6] In June of 2013, A.D. was a healthy, twenty-month-old toddler. On June 20, 2013, as usual for their day, Daniel had taken the older children to the backyard to eat and play. While Daniel was outside with the older children, Wahl remained inside with the toddlers for feeding. Due to the older children being outside, Wahl removed a compression gate between the kitchen area and the toddlers' sleeping area in the basement so as to allow the small children to move and play freely between the two rooms. In addition, Wahl also placed a child in a highchair in the kitchen for feeding and walked back to the kitchen sink to warm bottles.

[7] The record shows that in addition to the compression gate that divided the toddlers' sleeping area and a play area adjoining the kitchen, there was a white metal security gate positioned in the basement hallway that was used to prevent

the children from accessing the stairway leading to the first floor.[1]  As Wahl was standing in the kitchen, she heard the white metal security gate being "jingled." (Transcript p. 405).  Immediately, Wahl walked over to inspect.  There, she found A.D. and another child playing with the gate.  Wahl removed and placed both children across the room, admonished them, and returned to the kitchen to retrieve the child she had left in the highchair, and to grab a bottle.

[8]   From the kitchen, only a portion of the white metal security gate was visible. As Wahl was lifting the child from the highchair, she saw the child that A.D. had been playing with had passed the white metal security gate.  Wahl immediately placed the baby she was carrying on the floor and rushed towards the gate.  Like the other toddler, A.D. had breached the white metal security gate; however, as A.D. was returning to the play area adjoining the kitchen, his head became trapped between the latch end of the gate and the wall.  At first, Wahl thought A.D. was okay since his eyes were open.  Wahl freed A.D. from the white metal security gate, and noticed that A.D. was unresponsive and not

---

[1] The Wahls had placed several security gates in their home.  From what we can decipher from the record, there were about four security gates.  On the first floor, there was a white metal gate closing off the stairway leading to the second floor.  In the basement hallway, there was a similar white metal security gate—at issue in this cause—closing off the stairway leading to the first floor.  In addition, there was a long plastic compression gate dividing a large room in the basement into two sections.  Lastly, there was a small plastic compression gate diving the toddlers' sleeping area and the kitchen area.

breathing. Promptly, Wahl began performing CPR on A.D. As she was doing that, she saw two older children who had been out in the yard, and she requested them to call Daniel. The children did not comprehend, so Wahl momentarily left A.D. on the floor, rushed to the base of the stairway, and yelled for assistance. Moments later, Daniel re-entered the basement, intercepted the CPR process and asked Wahl to call 911. Within minutes, the Fishers Police Department arrived followed by the paramedics. A.D. was then transported to Community North Hospital, where he was pronounced dead at 12:59 p.m. The following day, the autopsy showed that A.D. had died from asphyxiation.

[9] On September 19, 2013, the State filed an Information charging the Wahls[2] with involuntary manslaughter, a Class D felony, I.C. § 35-42-1-4 (2013). At trial, Detective James Hawkins (Detective Hawkins), a criminal forensic investigator testified that after he received a call from another officer, he immediately drove the Wahls' residence to investigate. He stated that the white metal security gate situated in the Wahls' basement hallway had been anchored on the west wall. On the east wall, there were two independent anchors with latches for the gate to lock into. The security gate had been installed in 2003

---

[2] Daniel appeals separately.

and was maintained by Daniel. Detective Hawkins noted that the "top anchor" on the west wall appeared as if it had "been ripped out and then re-anchored back in." (Tr. p. 335). On the east wall, he noted that there were a "bunch of wear marks at the receiving end of the top latch" and applying minor pressure "like a tap" would cause the gate to open. (Tr. p. 338). According to Detective Hawkins, the white metal security gate would not come into contact with the latches, and it caused the gate to swing north and south while open. He further testified that he learned from Daniel that there was a "wooden rocking chair [] on the north side of the gate," and a baby rocking swing on the south end. (Tr. p. 379). He added that both had been used to "keep the gate from moving when [the Wahls] wanted it shut." (Tr. p. 379). The wooden rocking chair had "a lot of wear marks on the [] vertical rail directly adjacent to where" it would "make contact with the baby gate." (Tr. p. 381).

[10] Danny described his son as a healthy and happy baby. He testified that "approximately a month and a half to two months" prior to A.D.'s death, he was in the Wahls' home either to drop off or pick up his children. (Tr. p. 263). Danny recalled that Wahl discussed A.D.'s progress with him, and he recalled Wahl stating that A.D. "can even push his way through the baby gate downstairs." (Tr. p. 263).

[11] The forensic pathologist who conducted A.D.'s autopsy stated that while there are many variables that are considered in determining how long it takes to asphyxiate, for small children, he indicated that it may take "approximately 90 seconds to 120 seconds" for asphyxiation to ensue; and it would take "no more

than 5 minutes" for a child to die. (Tr. p. 437). At the close of the evidence, the jury found the Wahls guilty as charged.

[12] Prior to sentencing, but after the jury returned a guilty verdict for the Wahls, the trial court received an email from Juror #7, which stated in part:

> At the start of deliberation the alternate juror started to take over deliberation and at that point, I interjected and went to the part in our paperwork that stated the alternate juror was not to have any part in the deliberation. From that point I felt like there was tension in the room between the other jurors. The reason that I feel that the alternate juror influenced the other jurors is because he took items out of the envelope and took the parts to the gate and operated the gate. I had emphasized to the other jurors that what we were dealing with was a very serious charge. I asked the other jurors if they had ever been incarcerated before. I told the jurors that I had been incarcerated and it is a life changing experience. After saying this, the alternate juror let out a big sigh, rolled his eyes and shook his head as if he was disgusted. Also, at one point, the alternate juror stood up and went to the [DVD] player. When he was asked what he was doing, he said he wanted to see a particular part in the video. He repeatedly played it over and over and increased the volume each time until everyone was watching it.

(Court's Exh. 1). On June 6, 2014, the trial court scheduled a hearing to determine the alleged jury misconduct. At the hearing, the Wahls moved for a mistrial and after both parties had presented their arguments, the trial court took the matter under advisement. On June 11, 2014, the trial court denied the motion. Following a sentencing hearing held on June 30, 2014, the trial court sentenced the Wahls to 1095 days in the Department of Correction (DOC) with 730 days executed and placed them both on probation for 365 days. In addition, the trial court ordered the Wahls to jointly and severally pay the

DiRenzos $22,353.72 in restitution with $20,232.52 of that amount being Danny's lost wages. In light of the jury misconduct, on July 29, 2014, the Wahls, through their appellate counsel, filed a motion to correct error and attached an affidavit from Juror #7 requesting the trial court to grant them a mistrial, or in the alternative, grant them a hearing to present evidence from Juror #7. Consequently, the State responded to the Wahls' motion on August 5, 2014, and on August 18, 2014, the trial court denied the Wahls' motion.

[13] Wahl now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Sufficiency of the Evidence*

[14] Wahl first argues that the evidence is insufficient to sustain her conviction. When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id*. We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id*.

[15] The version of Indiana Code Section 35-42-1-4(e) in effect at the time Wahl committed her crime provided that if: (1) a child care provider recklessly supervises a child; and (2) the child dies as a result of the child care provider's reckless supervision; the child care provider commits class D felony involuntary

manslaughter. Conduct is reckless if the person engaged in that conduct "in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." I.C. § 35-41-2-2(c). As charged, to convict Wahl of involuntary manslaughter, the State was required to prove that Wahl recklessly supervised A.D. and that A.D. died as a result thereof.

[16] Wahl argues that the evidence is insufficient to establish that she recklessly supervised A.D. "given her close proximity to A.D. when he went back to the gate moments after she had initially removed him from the gate." (Appellant's App. p. 15). The State called Vicki Allen (Allen) of the Indiana Family and Social Services Administration (FSSA) to testify regarding the standards imposed on child care providers while caring for children. Allen testified that according to Ind. Admin Code 3-1.1-36.5, children shall not be left unattended and must be "within sight or sound at all times,"—that is, to be seen "without obstruction and heard without obstruction." (Tr. p. 448).

[17] Here, the unrefuted evidence presented at trial established that, on the day in question, A.D. was not within Wahl's sight or sound at *all times*. As stated above, Wahl was first alarmed by A.D.'s and the other child's presence by the security gate when she heard it jingle. Wahl testified that she walked over to the security gate, scolded the children for playing with the security gate, and consequently removed them and placed them across the room. Shortly thereafter, Wahl returned to the kitchen to grab a bottle and pick up the baby she had left in the highchair. Unbeknownst to Wahl, A.D. and the other baby

had ventured back to the security gate. Moments later, Wahl returned to the gate area only to find that the security gate had been released from its latch, A.D. and the other baby were on the opposite end, and A.D. was wedged between the gate's latch and the wall.

[18] In addition, the State presented evidence that Wahl was aware that the gate did not function properly and had "placed furniture on both sides of the gate to help prevent the children from opening the gate." (Appellee's Br. p. 10). We note that the purpose of having a baby gate is to ensure that children do not wander off to unsupervised areas. Specifically, the State argues that failure to maintain a properly functioning gate knowing that there would be small children in the house capable of pushing through the gate, and the failure to make certain that the gate was properly latched after A.D. and other child had attempted to open it, is certainly an act committed in "plain, conscious, and unjustifiable disregard" of the harm that might result, and is indeed a "substantial deviation from acceptable standards of conduct," Ind. Code section 35-41-2-2(c).

[19] In *Philips v. State,* No. 29A02-1407-CR-503,___N.E.3d___ (Ind. Ct. App. Feb. 20, 2015), we affirmed Phillips conviction for reckless homicide on the basis that she was consciously aware of the potential harm of placing five-month-old C.T. inside a broken crib with additional padding. *Id*. at 4. On the day C.T. died, Phillips had fed C.T. and because it was naptime, she placed a folded queen size blanket inside a broken portable crib and laid C.T. inside. *Id*. Phillips left the residence at 12:20 p.m. Shortly after 3:00 p.m., Phillips' mother, who operated the daycare, went to check on C.T. and found him

unresponsive. *Id*. Phillips' mother called 911. *Id*. The paramedics and firefighters who arrived on the scene found that C.T. had no pulse and was cold to the touch. *Id*. C.T. was transported to the hospital where he was pronounced dead. *Id*. This court was unpersuaded that the jury got it wrong particularly because Phillips knew that the crib was broken, the crib had been labeled with multiple warnings instructing Phillips that it should never be used if there are any broken parts, and there were warnings stating that serious injury or death could result if such instructions were disregarded. *Id*. Under the circumstances presented, we found that a reasonable jury could infer that Phillips was aware of the potential harm and that she acted in conscious disregard of that harm when she placed C.T. for a nap in the broken crib with additional padding. *Id*. at 5.

[20] As in *Phillips*, we reject Wahl's argument that her conduct conformed to acceptable standard of conduct while caring for A.D. on June 20, 2013. At trial, Detective Hawkins pointed out that the gate did not lock into place, and it took insignificant effort to thrust it open. He also stated that because the gate did not latch properly, the Wahls had braced the gate with furniture to prevent it from swaying open. Moreover, there was evidence presented at trial that the Wahls knew that A.D. had become increasingly mobile, strong, and could breach the security gate. At trial, Danny stated about two months before A.D.'s death, Wahl admitted that A.D. could push his way through the baby gate downstairs. Wahl's claim that it was a different gate is nothing but an

invitation for this court to reweigh the evidence, which we will not do. *See Bailey*, 907 N.E.2d at 1005.

[21] Lastly, the State argues that the child-to-staff ratio was beyond the required limit and that it rose to the level of reckless supervision. We note that child-to-staff ratio means "the maximum number of children permitted per direct child care provider." Ind. Admin. § Code 3-1.1-7.1. Pursuant to Ind. Admin. Code § 3-1.1-36.5, the Wahls were allowed to have no more than six children from birth to 24 months; and at least two of the children should have been sixteen months old and walking. Allen testified that based on her initial investigation, Wahl was in charge of seven children instead of six. At a later interview, Wahl withdrew her prior statement and indicated that she was supervising six children on the day in question. Contrary to her latter statements, on appeal, Wahl argues that having one child over the number required is not a substantial deviation given her close proximity to A.D. the entire time on the day he died. We strongly disagree.

[22] According to the *Interpretative Guide for Child Care Home Rule* (2013), http://www.in.gov/fssa/files/BCC_Homes_Interpretative_Guide.pdf (last visited May. 9, 2015), the intent of Ind. Admin. Code 3-1.1-36.5, is "[t]o provide for the safety and developmental needs of the children. This rule recognizes that ratios need to be lower for younger children and assumes that children younger than 24 months place special demands on a caregiver due to their need for individual care and attention." We observe that the regulations were promulgated to ensure the health and safety of children entrusted to the care of

child providers. In light of this regulations objective, we find that Wahl's assertion that caring for one extra child was not an excessive violation of the regulations must fail. Also, pursuant to the reckless statute, we find that Wahl's aberration from the regulations should be considered as a substantial deviation from acceptable standards of conduct. *See* I.C. § 35-41-2-2(c).

[23] Moreover, we note that child security gates are protective barricades designed to prevent young children from accessing areas in the home that might be unsafe. The risk of death might not be probable but it would be real and substantial—something more than an abstract possibility. Although Wahl heard A.D. by the security gate the first time, she was unaware of A.D.'s presence by the gate the second time, and it placed A.D. in substantial danger that lead to his death. The record shows that A.D. was past the security gate and was crawling back to the play area when he got lodged in the gate. In addition, we find that permitting a child to wander off and access a gate that could easily be breached cannot be considered acceptable conduct. In light of the foregoing, we find that: Wahl recklessly supervised A.D. and that A.D. died as a result of Wahl's reckless supervision.

## II. *Motion to Correct Error.*

[24] Next, Wahl argues that the trial court abused its discretion by denying her motion to correct error based on alleged jury misconduct. In general, a trial court has broad discretion to determine whether to grant or deny a motion to correct error. *Volunteers of Am. v. Premier Auto Acceptance Corp.*, 755 N.E.2d 656, 658 (Ind. Ct. App. 2001). We will reverse only for an abuse of that discretion.

*Id.* An abuse of discretion occurs if the trial court's decision was against the logic and effect of the facts and circumstances before the court or if the court misapplied the law. *Id.* The trial court's decision comes to us cloaked in a presumption of correctness, and the appellant has the burden of proving that the trial court abused its discretion. *Id.* In making our determination, we may neither reweigh the evidence nor judge the credibility of witnesses. *Id.* Instead, we look at the record to determine if: (a) the trial court abused its judicial discretion; (b) a flagrant injustice has been done to the appellant; or (c) a very strong case for relief from the trial court's [order] . . . has been made by the appellant. *Id.*

[25] Wahl maintains that the interference by the alternate juror during jury deliberations constituted impermissible extra-judicial communication. As mentioned earlier, prior to sentencing and after the jury returned a guilty verdict for the Wahls, the trial court received an email from Juror #7, who indicated that the alternate juror had involved himself in the jury deliberations. A hearing was conducted on June 6, 2014, and the Wahls moved for a mistrial. Subsequently, on June 11, 2014, the trial court denied the Wahls' motion and stated in part:

> There is no evidence of extrajudicial jury taint because the alternate juror's misconduct was in his unspoken handling of the items properly admitted into evidence, properly in the jury room during deliberations and properly able to be considered by the jury. Even if his actions may be considered to be extrajudicial, they were harmless . . .

(Appellant's App. p. 90). Shortly after sentencing, the Wahls filed a motion to correct error exclusively supported by Juror #7's affidavit reiterating the statements made in the prior email.

[26] The State maintains that when a defendant seeks a new trial based on jury misconduct, she must show that the misconduct was (1) gross and (2) she was probably harmed. *See Griffin*, 754 N.E.2d at 901. We disagree that this is the correct standard of review. Most recently, our supreme court in *Ramirez v. State*, 7 N.E.3d 933, 938 (Ind. 2014), took into account the confusion involved when determining jury taint and sought to clarify the existing precedents. In particular, the court stated: "[F]ederal and Indiana precedent has narrowed the presumption of prejudice to apply in cases where defendants show more than just potential taint—but some Indiana precedent, including our own, has applied that presumption inconsistently. We now clarify its precise scope, and reiterate the proper process for trial courts to address jury taint in the courtroom." *Id.* at 935. In clarifying the law regarding the various standards courts should apply on suspected jury taint, our supreme court stated:

> Defendants seeking a mistrial for suspected jury taint are entitled to the presumption of prejudice only after making two showings, by a preponderance of the evidence: (1) extra-judicial contact or communications between jurors and unauthorized persons occurred, and (2) the contact or communications pertained to the matter before the jury. The burden then shifts to the State to rebut this presumption of prejudice by showing that any contact or communications were harmless. If the State does not rebut the presumption, the trial court must grant a new trial. On the other hand, if a defendant fails to make the initial two-part showing, the presumption does not apply. Instead, the trial court must apply the probable harm standard for juror

misconduct, granting a new trial only if the misconduct is "gross and probably harmed" the defendant. *Henri v. Curto*, 908 N.E.2d 196, 202 (Ind. 2009) (internal quotation marks omitted). But in egregious cases where juror conduct fundamentally compromises the appearance of juror neutrality, trial courts should skip [the] two-part inquiry, find irrebuttable prejudice, and immediately declare a mistrial. At all times, trial courts have discretion to decide whether a defendant has satisfied the initial two-part showing necessary to obtain the presumption of prejudice or a finding of irrebuttable prejudice.

*Id*. at 939 (internal citations omitted). According to the test proponed in *Ramirez*, Wahl is required to show by a preponderance of the evidence that: (1) the alternate juror communicated with jurors without authorization; and (2) about the matter before the jury. We will first establish whether Wahl has met her initial two-part inquiry of prejudice.

## A. *Prejudice*

[27] It is a long-established principle in Indiana jurisprudence that a jury's verdict may not be later impeached by the jurors who returned it. *Ward v. St. Mary Med. Ctr. of Gary*, 658 N.E.2d 893, 894 (Ind. 1995). The policy reasons for this are that "(1) there would be no reasonable end to litigation, (2) jurors would be harassed by both sides of litigation, and (3) an unsettled state of affairs would result." *Id*. This principle is also set forth in Indiana Evidence Rule 606(b) which provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's

mental processes in connection therewith, except that a juror may testify (1) to drug or alcohol use by any juror, (2) on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or (3) whether any outside influence was improperly brought to bear upon any juror.

Thus, a rebuttable presumption of prejudice will arise if jurors engage in misconduct by out-of-court communications with unauthorized persons. *Spears v. State*, 811 N.E.2d 485, 488 (Ind. Ct. App. 2004). In *Griffin*, our supreme court explained that an alternate juror is not a member of the jury, "and he or she qualifies as an outside influence under Rule 606(b)." *Griffin*, 754 N.E.2d at 903. Lastly, we note that when evaluating jury misconduct, we consider juror affidavits to the extent they assert the deliberations were tainted by improper influence. *Majors v. State*, 773 N.E.2d 231, 234 n. 1 (Ind. 2002).

[28] Here, the jury was instructed that the "alternate will be with you in the room but is not permitted in your deliberations or verdict." (Appellant's App. p. 66). According to Juror #7's affidavit, after the jury retired to the jury room and contrary to the trial court's instructions, the alternate began leading the jury in the discussions. After been asked to withdraw, he proceeded to test and experiment with the white metal security gate while discussions were ongoing. In addition, the alternate juror repeatedly replayed a video which led the jurors to interrupt their discussions and watch a particular portion of the video. From the foregoing, it is clear that the alleged communication—both spoken and unspoken—constituted impermissible communication barred under Rule 606(b), and it related to a matter before the jury. Having established that Wahl

met her burden pursuant to *Ramirez*, the burden now shifts to the State to show that the alternate juror's out-of-court communication was harmless.

### B. *Whether the Out-of-Court Communication by the Alternate Juror was Harmless*

[29]   The State maintains that it rebutted the presumption of prejudice since the evidence of the alleged misconduct amounts to "harmless childish behavior." (Appellee's Br. p. 16).  Specifically, the State argues that according to Juror #7 affidavit, "it appears that the alternate refrained from speaking with the other jurors once it was pointed out to him that he was not to participate in the deliberations. (Appellee's Br. p. 17).  In addition, the State argues that all the "alternate juror allegedly did was play with properly admitted evidence during the deliberations." (Appellee's Br. p. 14).

[30]   We note that the test for harmless error is not whether there was substantial evidence of the defendant's guilt but whether the error contributed to the verdict.  *Hall v. State*, 796 N.E.2d 388, 396–97 (Ind. Ct. App. 2003), *trans. denied*.  As noted above, the jury was admonished before retiring and they were well aware that the alternate juror was not to take part in the discussions.  Also, the trial court tendered an instruction, reminding the jurors that their verdict must be based solely on the evidence presented at trial.  We must presume that the jury followed the trial court's instructions.  *Harris v. State*, 824 N.E.2d 432, 440 (Ind. Ct. App. 2005).  *See also Henriquez v. State*, 973 N.E.2d 1154 (Ind. Ct. App. 2012) (noting that juries tend to monitor themselves pretty well and that if

the alternate is trying to deliberate, the other jurors would stop him or bring it to the court's attention) *trans. denied.*

[31] Here, Juror #7 advised the alternate juror to cease and desist from discussions, and we presume that the other jurors were attentive of that warning. Because we find that the jury was obviously aware that the alternate juror was not meant to participate in the discussions, any transient comments that the alternate juror made at the commencement of the jury deliberations or his curiosity to experiment with the exhibits admitted into evidence, did not introduce new material into deliberations that was not already known by the jury from the trial itself. On these facts, it is plain to us that, while Wahl may have met her initial burden, the State rebutted the alleged misconduct, and without more, we cannot say that the trial court abused its discretion in denying Wahl's motion to correct error.

### III. *Inappropriate Sentence*

[32] Next, Wahl argues that her sentence was inappropriate in light of the nature of the offense and her character. Indiana Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). "Ultimately the length of the aggregate sentence and how it is to be served are

the issues that matter." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). Whether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other considerations that come to light in a given case. *Id.*

[33] The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Abbott v. State*, 961 N.E.2d 1016, 1019 (Ind. 2012). At the time of his sentencing, the advisory sentence for a Class D felony was one-and-one-half years, with a minimum of six months and a maximum of three years. Here, the trial court imposed the maximum sentence but suspended one year to probation. In arriving at this sentence, the trial court found as mitigating circumstance the fact that Wahl had no criminal history at the time. However, the trial court found the nature of the offense and the fact that the victim was "less than 12 years of age" to be an aggravating circumstance. (Tr. p. 852). *See Kile v. State*, 729 N.E.2d 211, 214 (Ind. Ct. App. 2000) (holding that the trial court did not err in using the particularized factual circumstances of the case—namely the victim's age—as an aggravating factor).

[34] As for the nature of the offense, Wahl argues that she "was not asleep or on another floor of the house; she was [a mere] 8-10 feet away from A.D." (Appellant's Br. p. 23). She further argues that a portion of the security gate was "visible from the [] kitchen" and she had just been able to overhear A.D. and another child jingle the gate minutes before. To her defense, she argues that the moment she observed A.D. stuck in the gate, she quickly removed him

from danger and began performing CPR. We are not persuaded by Wahl's arguments. At trial, the forensic pathologist testified that for young children such as A.D., it may take "approximately 90 seconds to 120 seconds" for asphyxiation to ensue; and it would take "no more than 5 minutes" for a child to die. (Tr. p. 437). Moreover, as discussed in the foregoing, as a child care provider, Wahl was to keep A.D. within sight or sound at all times. The record reveals that the security gate did not latch properly and A.D. had successfully breached the gate. As such, Wahl's argument that A.D. was just 8-10 feet away, does not alter the fact that A.D. wandered off to an unsupervised area, and within minutes, his neck got stuck in a defective gate that triggered his death.

[35] Turning to Wahl's character, we note that she has led a law-abiding life prior to the events of June 20, 2013. At her sentencing hearing, Wahl presented twenty-three letters from friends and families who attested that she was a generous and loving person as well a good Christian. Though we find that her good character is indeed redeeming, it does not alter the seriousness of the charged offense. Wahl recklessly supervised A.D., and he died under her care. After due consideration of the evidence presented at trial, we cannot say that the sentence imposed by the trial court is inappropriate.

## IV. *Restitution*

[36] Finally, Wahl contends that the trial court abused its discretion in ordering that she jointly and severally pay $20,237.52 in restitution to the DiRenzos for Dannny's lost wages. At the sentencing hearing, Danny stated that he had

missed a total of 53 days of work due to A.D.'s death. We reverse a trial court's order to pay restitution only for an abuse of discretion. *Gil v. State*, 988 N.E.2d 1231, 1234 (Ind. Ct. App. 2013). A trial court abuses its discretion if its "decision is clearly against the logic and effects of the facts and circumstances before it" or if it "misinterprets or misapplies the law." *Id.*

[37] Indiana Code section 35-50-5-3(a) provides, in relevant part, that "in addition to any sentence imposed under this article for a felony or misdemeanor, the court may . . . order the person to make restitution to the victim of the crime[.]" When such an order is entered, it must be based upon a consideration of:

> (1) property damages of the victim incurred as a result of the crime, based on the actual cost of repair (or replacement if repair is inappropriate);
> (2) medical and hospital costs incurred by the victim (before the date of sentencing) as a result of the crime;
> (3) the cost of medical laboratory tests to determine if the crime has caused the victim to contract a disease or other medical condition;
> (4) earnings lost by the victim (before the date of sentencing) as a result of the crime including earnings lost while the victim was hospitalized or participating in the investigation or trial of the crime; and
> (5) funeral, burial, or cremation costs incurred by the family or estate of a homicide victim as a result of the crime.

*Id.* An order of restitution is as much a part of a criminal sentence as a fine or other penalty. *Kotsopoulos v. State*, 654 N.E.2d 44, 46 (Ind. Ct. App. 1995). It is well established that the restitution order must reflect the actual loss sustained by the victim. *Smith v. State*, 471 N.E.2d 1245, 1248 (Ind. Ct. App. 1984), *trans. denied.* The amount of actual loss is a factual matter, which can be determined

only upon presentation of evidence. *Id.* A restitution order must reflect a loss sustained by the victim as a direct and immediate result of the defendant's criminal acts, and the trial court may consider only expenses incurred by the victim prior to the date of sentencing. *Rich v. State*, 890 N.E.2d 44 (Ind. Ct. App. 2008), *trans. denied*.

[38]  Here, Wahl argues that although Danny "presented documentation for his requested loss of wages" none of them explained why he missed work for a total of 53 days. (Appellant's Br. p. 28). In response, the State maintains that Wahl failed to lodge an objection to that amount. After reviewing the transcript, we agree with the State that Wahl did not specifically object to the payment of Danny's loss of wages. Also, our review of the record reveals that Wahl did not lodge any objection at the sentencing hearing or the trial court's consideration of the documents that Danny submitted for his loss of wages before the sentencing hearing.

[39]  "Generally, failure to object to an award of restitution constitutes waiver of a challenge to the award on appeal, unless a defendant argues that the award was fundamentally erroneous and in excess of statutory authority." *Morris v. State*, 2 N.E.3d 7, 9 (Ind. Ct. App. 2013), *opinion on reh'g*. "[A] defendant's failure to make a specific and timely objection to the trial court's receipt of evidence concerning the amount of restitution constitutes waiver of the issue on appeal." *Id.* Waiver notwithstanding, we recognize the vast weight of case law in this state indicates that appellate courts will review a trial court's restitution order even where the defendant did not object based on the rationale that "a

restitution order is part of the sentence, and 'it is the duty of the appellate courts to bring illegal sentences into compliance.'" *Cherry v. State*, 772 N.E.2d 433, 440 (Ind. Ct. App. 2002) (quoting *Golden v. State*, 553 N.E.2d 1219, 1223–24 (Ind. Ct. App. 1990), *trans. denied*)).

[40] A.D. died on June 20, 2013, and Danny took time off work to grieve the loss of his son. According to the pre-sentence investigation report, Danny missed work from June 21 through August 30, 2013. He was also absent for two days from May 13-14, 2014, to attend the Wahls' trial. Lastly, Danny missed a day of work on June 12, 2014, to attend the sentencing hearing. At the sentencing hearing, Danny testified that even though he was compensated while on leave, given that he used up his leave days meant that he lost income of $ 20,237.52 which he would have netted upon retirement. Danny is a federal employee and has been for the past sixteen years. Under 5 U.S.C. § 5551(a), federal employees who are separated from service are entitled to receive a lump sum payment for the annual leave that they have accrued but not taken. We note that had Danny not been forced to expend his annual leave, he would have been entitled to a lump-sum cash payment for any unused leave in the event of retirement as federal employee pursuant to 5 U.S.C. § 5551. In light of the foregoing, the trial court properly ordered restitution for loss of wages.

## CONCLUSION

[41] Based on the foregoing, we conclude that (1) there was sufficient evidence to support Wahl's conviction for involuntary manslaughter; (2) the trial court did not abuse its discretion in denying Wahl's motion to correct error based on jury

misconduct; (3) Wahl's sentence is appropriate; and (4) the trial court did not abuse its discretion in ordering restitution.

[42]    Affirmed.

[43]    Barnes, J. concurs

[44]    Bailey, J. dissents with separate opinion

# COURT OF APPEALS OF INDIANA

Saundra S. Wahl,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

Court of Appeals Case No.
29A04-1409-CR-418

## Bailey, Judge, dissenting.

I respectfully dissent, because cumulative error denied Wahl a fair trial. I am convinced that the alternate juror crossed a line in his persistent efforts to influence the duly-selected jurors. Even more egregious, Wahl's Involuntary Manslaughter conviction was achieved by merging regulatory concepts into the definition of recklessness as set forth by our Legislature in the Criminal Code. Administrative code provisions, State's Exhibit 65, were submitted as

"evidence."[3]  The practical effect, however, was that the provisions were used to supplement the trial court's instruction on the law and the jury was, in essence, invited to impose a form of strict criminal liability for a child care provider's non-compliance with provisions of an administrative code.  In light of the very tragic events, the jury complied.

[46]  A criminal conviction absent proof beyond a reasonable doubt on each element of the charged crime amounts to fundamental error.  *In re Winship*, 397 U.S. 358, 361, 90 S.Ct. 1068 (1970).  The State charged that Wahl recklessly supervised A.D. and thereby violated Indiana Code Section 35-42-1-4(e), which at that time provided:  "If:  (1) a child care provider recklessly supervises a child; and (2) the child dies as a result of the child care provider's reckless supervision; the child care provider commits involuntary manslaughter, a Class D felony."  Indiana's Criminal Code provides that one acts recklessly "if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct."  I.C. § 35-41-2-2(c).

---

[3] Pursuant to Indiana Evidence Rule 401, relevant evidence is that which "has any tendency to make a *fact*, more or less probable than it would be without the evidence, and the *fact* is of consequence in determining the action. (emphasis added.)

[47] The theory of prosecution was that non-conformance with regulatory standards (one too many children or improper maintenance) is necessarily "a substantial deviation from acceptable standards of conduct" as an element of the charged crime. The State offered as an exhibit the language of Indiana Administrative Code Section 3-1.1-36.5 (setting forth the child to staff ratio and stating that children are to be supervised at all times) and asked Vicki Allen to explain or define "supervision" within the meaning of the regulatory provision. When asked "what does that mean," she responded: "The children need to be within sight or sound at all times." (Tr. 448.)

[48] Subsequently, in closing argument, the State invited the jurors to convict Wahl on this basis:

> Twenty month old [A.D.] died on June 20, 2013 because of the reckless supervision of Saundra and Daniel Wahl. *He was playing outside of the sight or hearing of Saundra Wahl* when Saundra was supervising too many infants in addition to [A.D.]. And he and another child breeched the gate – this gate – that was maintained by Daniel Wahl, and he died in that gate.

(Tr. 675.) (emphasis added.) In discussing the elements of the crime, the Prosecutor read the statutory definition of "recklessness" (including its reference to acceptable standards of conduct), and then supplemented the definition with reference to Allen's testimony:

> First, what were the acceptable standards of conduct? Well, Vicki Allen described what the minimum State standards were. You can exceed those standards, but that's the minimum. . . . They would round up [child ages]. Their supervision they felt was good enough. The gate was good enough. Well, it's not good enough. It's not

sufficient. And it wasn't just in one area. . . . *We know what the standards are for supervision. We have two of those. There's in sight or hearing, and there's the child-to-staff ratio.* The Wahls didn't meet either of those.

(Tr. 678-79.) (emphasis added.)

[49] In short, the State engrafted language from a regulatory scheme into the Criminal Code, such that "a substantial deviation from acceptable standards of conduct" became "a substantial deviation from child care provider standards." This invaded the province of the jury whose duty it was to determine whether conduct was so substantial in its deviance that it amounted to *criminal* reckless conduct.

[50] The State should indeed insist upon high standards for child care providers. That said, it is perplexing that the Prosecution – and the State on appeal – appear satisfied that any failing to provide the best possible care amounts to criminal conduct. The State's brief urges: "When it comes to the care of children in a for-profit day care facility, any deviation from the required regulations should be considered a substantial deviation from acceptable standards of conduct." (State's Br. at 10.) This may well be true in a civil context, but we are here concerned with a *criminal* substantial deviation from acceptable standards of conduct. It is also troubling that the State urges affirmance of a criminal conviction because of the "child-to-staff ratio" and "fail[ure] to insure that the child gate functioned properly and safely." (State's

Br. at 10.) I feel compelled to observe that such "criminal" conduct was not specifically charged in the Involuntary Manslaughter charging information.

[51] In all conduct subject to regulation by this State, such as the operation of a business or profession, there is potential for negligence, gross negligence, or criminality. Individuals frequently fall short of the standards set by regulatory schemes. This can, and should, result in penalties such as warnings, revocation of licenses, fines, or other penalties of a civil nature. Egregious conduct can, and should, result in the bringing of criminal charges. However, in those situations, the conduct proscribed is that defined by our Legislature in the Criminal Code and the jury is the arbiter of community standards. A jury of one's peers is entrusted with the determination of whether the accused acted in a manner that is so removed from acceptable community standards that he or she should be convicted of a felony and locked away from society.

[52] In my opinion, Wahl's conviction was not a product of constitutionally adequate proceedings and amounts to fundamental error. Accordingly, I respectfully dissent.