

FILED

May 12 2020, 8:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Russell B. Cate
Carmel, Indiana

Christopher J. Evans
Dollard Evans Whalin, LLP
Noblesville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian A. McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Daniel Wahl and Saundra Wahl, *Appellants-Defendants,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | May 12, 2020 <br><br> Court of Appeals Case No. <br> 19A-CR-2258 <br><br> Appeal from the Hamilton Superior Court <br><br> The Honorable David K. Najjar, Judge <br><br> Trial Court Cause Nos. <br> 29D05-1309-FD-7823 & <br> 29D05-1309-FD-7824 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellants-Defendants, Daniel Wahl (Daniel) and Saundra Wahl (Saundra), (collectively, the Wahls), appeal their conviction for involuntary manslaughter, Class D felonies, Ind. Code § 35-42-1-4 (2013).

We affirm.

# ISSUES

The Wahls present this court with four issues on appeal, which we consolidate and restate as the following three issues:

> (1) Whether the trial court abused its discretion by admitting certain evidence;
>
> (2) Whether the State presented sufficient evidence to sustain the Wahls' involuntary manslaughter conviction; and
>
> (3) Whether the trial court abused its discretion by ordering the Wahls to pay restitution.

# FACTS AND PROCEDURAL HISTORY

In 2003, the Wahls built their home in Fishers, Indiana, with the primary intention of operating a daycare facility from their basement. In 2006, the Wahls were licensed and they operated a daycare business under the name, Home Away from Home Child Care, LLC. Saundra was responsible for toddlers ranging from five months to two years old, while Daniel was

responsible for the older children. In the spring of 2011, after touring the Wahls' daycare, Danny (Danny) and Jocelyne DiRienzo (collectively, the DiRienzos), enrolled their minor children, D.D., and A.D. at the Wahls' daycare.

[5] The Wahls had placed several security gates in their home. In the basement hallway, there was a white metal security gate—the gate at issue in this cause—closing off the stairway leading to the first floor. If the gate was open, one had to pick up the gate and bring it over and place it down into a U-shaped cradle where it would snap into place. In 2006, Daniel made repairs to the gate's hinges "because it [had] started to give way." (Transcript Vol. II, p. 172). More specifically, the screws used to secure the gate's hinges had started pulling out from the "wood studs in the wall." (Tr. Vol. II, p. 172). Instead of using regular screws, Daniel used "some bolts and washers and nuts to hold it in place." (Tr. Vol. II, p. 173). To do all of that, he "went behind the wall and added two additional wood studs, got long bolts, drilled through, put those on with washers behind it and lock nuts so that they wouldn't come loose." (Tr. Vol. II, p. 173). Then sometime in 2006, Daniel made further improvements to the gate since a spindle had come loose, and he reattached it with some epoxy glue. According to Daniel, the Indiana Family and Social Services Administration (FSSA) had never given any directives or corrective actions to the Wahls regarding the gate.

[6] In June of 2013, A.D. was a healthy, twenty-month-old toddler. On June 20, 2013, between 8:00 a.m. and 10:00 a.m., Daniel was in the backyard greeting

parents as they came in with their children. Daniel kept the older children with him, and he took the younger children to the basement to be cared for by Saundra. After the older children had lunch outside, Daniel lined them up at the stairway leading to the basement to go inside for their scheduled naps. At that moment, Daniel heard Saundra scream for help. After ensuring that all the children were inside the house, he proceeded to go to the basement. There, he found Saundra standing over A.D. who was lying motionless on the basement floor. Immediately, Daniel began performing CPR on A.D. while Saundra called 9-1-1.

[7] At approximately 12:23 p.m., Officer Ryan Ermel (Officer Ermel) of the Fishers Police Department was first to arrive at the Wahls' residence. Officer Ermel found Daniel administering CPR to A.D. and he assisted with the process. Shortly thereafter, the EMTs and two other officers arrived. The EMTs took over the CPR process and A.D. was transported to the Community North Hospital emergency room. At approximately 12:52 p.m., Detective David Finn (Detective Finn), arrived at the Wahls' residence and he began questioning Daniel as to the daily daycare procedures.

[8] At 12:59 p.m., A.D. was pronounced dead. During Daniel's narration of the daily daycare procedures to Detective Finn and another officer, Saundra emerged from the basement and ran up the stairs to inform Daniel that A.D. was deceased. Detective Finn stopped questioning Daniel so that Daniel could give Saundra some comfort. After a few minutes, Detective Finn sat down with Saundra and Daniel. Saundra was still hysterical, and she was crying about

"how this wasn't supposed to happen[,] and this shouldn't have happened."
(Appellant's App. Vol. IV, p. 220). During this time, a chaplain arrived and
met with both Daniel and Saundra and he prayed with them. Detective James
Hawkins (Detective Hawkins) and Detective Doug Baker (Detective Baker)
arrived at the Wahls' residence. At that point, Detective Finn asked Daniel to
recite the events that took place during the time of the incident. Detective
Hawkins then started processing the scene, while Detective Baker spoke with
Saundra.

[9] During the afternoon, other officers continued to arrive. One officer asked
Daniel for a contact list of the children's parents. After about 15 to 20 minutes,
Daniel had not found the parents contact list but eventually either Daniel or
Saundra provided the list. The police began contacting the parents of the
children. The Wahls' residence was taped off, and a canopy was set up close to
their residence so that parents of the other children could retrieve their children
without going inside the house.

[10] As Detective Hawkins took photographs of the interior of the house, he noticed
that the basement hallway gate where A.D. had become lodged opened easily
with "[m]aybe a couple pounds" of pressure: "I mean it was, there wasn't
much to it. It was just the very tip of that metal and you can kind of see all the
wear marks[,] so it was, there wasn't a whole lot to it. You just sort of pop it
open." (Tr. Vol. III, p. 76). Daniel, who was also in the basement at this time,
informed Detective Hawkins that he and Saundra mitigated the issue "by

placing some furniture on either side of the gate to try to keep the kids from pushing through it." (Tr. Vol. III, p. 76).

[11] At around 5:00 p.m., there were no children inside the residence, but there were multiple officers in the home. Detective Finn asked Saundra to participate in a video reenacting the events leading to the moment she discovered A.D. stuck in the gate. Saundra stated that she had left A.D. with another child, who was less than two years of age, at the far end of the toddler and infant room. Saundra stated that she walked into the kitchen to feed another young girl who was seated in a highchair, and after she fed the child in the highchair, she momentarily faced away from the toddler and infant room and began warming milk bottles in the sink. Once the bottles were warm, she picked up the child from the highchair and carried her on her hip along with a bottle back into the toddler and infant room. Once in the toddler and infant room, she saw A.D. face down, wedged at the neck between the basement metal security gate and the wall. Saundra sat the child she was carrying down, and attended to A.D. After Saundra freed A.D. from the white metal security gate, she noticed that A.D. was unresponsive and not breathing. Saundra promptly began performing CPR on A.D. As she was doing that, she saw two older children who had been out in the backyard, and she requested that they call Daniel. The children did not comprehend, so Saundra momentarily left A.D. on the floor, rushed to the base of the stairway, and yelled to Daniel for assistance.

[12] When asked to reposition the furniture that was close to the metal security gate, she placed a rocking chair facing the infant room with its back against the gate,

and she placed a swing on the other side of the gate leading to the stairway. Saundra explained that she needed to do that because if the children shook it "real hard, they would loosen" the gate. (State's Exh. 45 at 4:28). Saundra was then asked to place a doll in the position where she found A.D. stuck in the gate. Detective Finn observed that the white metal security gate that had choked A.D. did not latch correctly. Detective Finn also observed that if the gate was open, there was no line of sight from the kitchen. At the end of the interview, the officers removed the gate from the residence and took it with them.

[13] On September 19, 2013, the State filed an Information, charging the Wahls with involuntary manslaughter, a Class D felony. They were tried jointly and found guilty by a jury. They appealed separately, arguing that there was insufficient evidence to sustain their convictions, the trial court erred when it declined to grant a mistrial due to juror misconduct, their sentences were inappropriate, and that the trial court erred in ordering restitution. We affirmed their convictions in separate opinions: *Wahl v. State*, 36 N.E.3d 1163 (Ind. Ct. App. 2015) (Daniel's); and *Wahl v. State*, 36 N.E.3d 1147 (Ind. Ct. App. 2015) (Saundra's). Our supreme court granted transfer and consolidated their cases. The supreme court consequently found that the Wahls' motion for mistrial due to juror misconduct should have been granted, it reversed their convictions, and it remanded their cases for a new trial. *See Wahl v. State*, 51 N.E.3d 113 (Ind. 2016).

[14] The Wahls were tried jointly at another jury trial on August 7 through August 9, 2019. Before their second trial, the Wahls filed their expert witness list, disclosing Dr. Edward Dragan (Dr. Dragan) as a potential expert witness. In a deposition before their second trial, Dr. Dragan had testified that his area of expertise was reading and interpreting regulations that were applicable to daycares. However, Dr. Dragan stated that his area of expertise did not involve interpreting regulations affecting daycares for children under the age of three. Based on Dr. Dragan's deposition testimony, the State filed a motion in *limine*, seeking to exclude Dr. Dragan's testimony, arguing that Dr. Dragan did not qualify as an expert under Indiana Rules of Evidence 702 because his expertise did not involve the care of infants and toddlers under three years of age. Following a hearing, the trial court issued an order in favor of the State, after concluding that Dr. Dragan could not be qualified to testify as an expert since "[a] very small amount of Dr. Dragan's education and professional experience involves preschool programs, and none of it involves in-home daycare for children under three years of age." (Appellant's App. Conf. Vol. IV, p. 85).

[15] During the second trial, the Wahls moved to suppress the photographs taken from inside the residence, an audio recording of the Wahls which was conducted in the living room, a video recording of Saundra reenacting the events that occurred before she discovered A.D. stuck in the gate, and the metal security gate that trapped A.D. A suppression hearing was held outside the jury's presence, and the trial court heard testimony from several officers. At the conclusion of that hearing, the trial court excluded the physical gate from

evidence, but it determined that the other evidence, including the video reenactment where Saundra explained the events leading to A.D. being stuck in the gate, was admissible. After the presentation of all the evidence, the jury found the Wahls guilty of involuntary manslaughter.

[16] The record shows that at the first sentencing hearing, Danny, A.D.'s father, testified as to the expenses he incurred, such as A.D.'s hospital and funeral expenses, therapy for his wife, and his loss of wages, to support a restitution order against the Wahls. On August 26, 2019, the day before the Wahls' second sentencing hearing, the State filed a motion, seeking judicial notice of Danny's prior testimony to support a restitution claim against the Wahls. The trial court granted the State's motion. At the start of the second sentencing hearing, the trial court additionally stated that for purposes of having a complete record, it would take judicial notice of the Presentence Investigation report (PSI) submitted at the first sentencing hearing, the addendum, and the sentencing order which included a restitution order against the Wahls in the amount of $22,353.72. The trial court subsequently sentenced the Wahls to 550 days in the Department of Correction, with credit for 550 days served. Also, the trial court ordered the Wahls to pay restitution to the DiRienzos in the amount of $22,353.72.

[17] The Wahls now appeal. Additional information will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Admission of the Evidence*

When ruling on the admissibility of evidence, the trial court is afforded broad discretion, and we will only reverse the ruling upon a showing of abuse of discretion. *Gibson v. State*, 733 N.E.2d 945, 951 (Ind. Ct. App. 2000). An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Id.* We consider the evidence most favorable to the trial court's ruling and any uncontradicted evidence to the contrary to determine whether there is sufficient evidence to support the ruling. *Id.*

While presenting similar but slightly different arguments, the Wahls assert that the trial court abused its discretion when it excluded Dr. Dragan from testifying as an expert witness. In addition, the Wahls contend that the trial court abused its discretion by admitting into evidence the video reenactment of Saundra explaining the events leading to A.D. being stuck in the security gate.

## A. *Expert Witness*

Indiana Evidence Rule 702, the evidentiary rule concerning expert testimony, provides:

> (a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

A trial court judge has broad discretion to admit or exclude the testimony of an expert witness under Rule 702. *Carter v. State*, 766 N.E.2d 377, 380 (Ind. 2002). The trial court's decision will only be reversed for an abuse of that discretion. *Id*.

[21] The trial court's order excluding Dr. Dragan's testimony, stated in part that

> Dr. Dragan has expertise in the area of education, school supervision and school safety, and expertise in regulations governing schools. The issues involved in this case, however, do not involve these topics. Here, the subject matter is the [Wahls'] supervision of a twenty-month old child in an in-home daycare. A very small amount of Dr. Dragan's education and professional experience involves preschool programs, and none of it involves in-home daycare for children under three years of age. As he testified in his deposition, Dr. Dragan has no professional experience at all with children younger than three years. . .

> [The Wahls] argue that the State ignores Dr. Dragan's six years of experience running a Head Start program from 1969 to 1975 for children from ages 3 to 5. But the relevant age group here is children under the age of 3. Dr. Dragan himself acknowledges that the level of supervision a child requires depends on the age and abilities of that child. He cannot be qualified to testify as an expert on the supervision required of children of an age and in a setting entirely outside his experience.

> While Dr. Dragan certainly has expertise, the [c]ourt cannot find that any of that expertise is within the subject matter on which he

would be called to testify in this proceeding - the standard of care for supervision of a twenty-month old child in an in- home daycare. . . . because his expertise does not lie within the area of his testimony, [his] testimony should be excluded.

(Appellant's App. Conf. Vol. IV, p. 85).

[22] A.D. was twenty-months old at the time of his death. As the trial court correctly noted, the Wahls' supervision of a twenty-month-old child in an in-home daycare was at issue, and Dr. Dragan had limited education and professional experience as to in-home daycare for children under three years of age. Thus, Dr. Dragan's testimony would not have assisted the jury in understanding the evidence or determine a fact in issue, *i.e.,* whether the Wahls' provided adequate supervision to A.D. prior to his death. Accordingly, Dr. Dragan's testimony was irrelevant, and the trial court acted within its discretion to exclude his testimony. *See Carter*, 766 N.E.2d at 380.

[23] Further, we note that at the close of the evidence, the Wahls made an offer of proof regarding Dr. Dragan's proposed testimony. *See Woods v. State*, 892 N.E.2d 637, 641-42 (Ind. 2008) (holding that "[t]he purpose of an offer of proof is to convey the point of the witness's testimony and provide the trial [court] the opportunity to reconsider the evidentiary ruling.") In pertinent part, the Wahls claimed that Dr. Dragan would have testified that FSSA was responsible in overseeing licensing and monitoring home daycare, and because FSSA had never cited the Wahls for a defective gate, such testimony would have been helpful in determining if the Wahls were criminally liable. When an expert's

testimony is, essentially, an assertion that a party has done no wrong as a matter of law, that testimony is inadmissible. *See* Ind. R. Evid. 704(b) (providing that "witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions"); *Schumm v. State*, 868 N.E.2d 1202,1204 (Ind. Ct. App. 2007) (defendant was not allowed to call police officer to testify that defendant's vehicle was in compliance with applicable regulations since such testimony would have resulted in the officer making a legal conclusion). Notwithstanding the Wahls' claim on appeal, the trial court could not have properly reconsidered its prior evidentiary ruling of excluding Dr. Dragan's testimony. *See Woods*, 892 N.E.2d at 641-42. Accordingly, we find no abuse of the trial court's discretion in excluding his testimony as an expert witness.

## B. *Video Reenactment*

[24] The Wahls argue that the trial court abused its discretion by denying their motion to suppress the video reenactment. Because the Wahls appeal after a completed trial, we review the trial court's ruling for abuse of discretion. *Reinhart v. State*, 930 N.E.2d 42, 45 (Ind. Ct. App. 2010). In our review, we do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Id*. We also defer to the trial court's factual determinations unless clearly erroneous. *Id*. However, we consider afresh any legal question of the constitutionality of a search or seizure. *Id*.

The Wahls collectively claim that when the video was taken, it violated their Fourth Amendment rights under the United States Constitution, and Article 1, Section 11 of the Indiana Constitution. Saundra additionally claims that her Fifth Amendment rights were violated when she was asked to participate in the reenactment video absent any *Miranda* warnings.

### 1. *Fourth Amendment Violation*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures" and generally prohibits searches and seizures without a warrant supported by probable cause. U.S. Const. amend. IV; *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013). As a result, evidence obtained without a warrant is generally inadmissible unless it falls within one of few well-delineated exceptions. *Id*. The State has the burden to show that one of these well-delineated exceptions was met. *Id*.

The Wahls concede that exigent circumstances existed after the police responded to the 9-1-1 call, however, they argue that their continued presence until 5:00 p.m. which led to the video reenactment, constituted an impermissible search not falling within any exception. The State argues the continued police presence in the Wahls' home and the recording fell under the exigency exception.

"The warrant requirement becomes inapplicable where the 'exigencies of the situation' make the needs of law enforcement so compelling that the

warrantless search is objectively reasonable under the Fourth Amendment.'" *Holder v. State*, 847 N.E.2d 930, 935 (Ind. 2006) (quoting *Mincey v. Arizona*, 437 U.S. 393-94, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)). Among the well-known exigent circumstances that have justified a warrantless search or seizure are entries (1) to prevent bodily harm or death; (2) to aid a person in need of assistance; (3) to protect private property; and (4) to prevent actual or imminent destruction or removal of incriminating evidence before a search warrant may be obtained. *Weis v. State*, 800 N.E.2d 209, 213 (Ind. Ct. App. 2003). In addition, we have found exigent circumstances where police entered to aid or prevent further injury to victims of violent crime. *State v. Straub*, 749 N.E.2d 593, 597 (Ind. Ct. App. 2001).

[29] The Wahls' 9-1-1 call invited police to enter the house and deal with an emergency. *See United States v. Risner*, 593 F.3d 692, 694 (7th Cir. 2010) (911 call seeking assistance is an invitation to enter and provide assistance). Notwithstanding the fact that A.D. had been removed from the home, once there, the officers found another emergency, namely, several other children in the daycare who had been present during the incident, it was of extreme concern for the officers to remove those children from the scene of the incident. Throughout the afternoon, and in conjunction with the Wahls, the police cared for the children and reunited them with their parents. While the video was taken after all the children had presumably been picked up by their parents and no exigency existed at the time, the State argues that the video was taken with Saundra's consent.

[30] Another well-recognized exception to the warrant requirement is a voluntary and knowing consent to search. *Primus v. State*, 813 N.E.2d 370, 374 (Ind. Ct. App. 2004). The theory underlying the consent exception is that, when an individual gives the State permission to search either his person or property, the governmental intrusion is presumably reasonable. *Id.* A defendant's consent to search is valid except where procured by fraud, duress, fear, or intimidation or where it is merely a submission to the supremacy of the law. *Buckley v. State*, 797 N.E.2d 845, 849 (Ind. Ct. App. 2003). Because it falls within an established exception to the Fourth Amendment warrant requirement, the scope of the authority to search is strictly limited to the consent given, and a consensual search is reasonable only if it is kept within the bounds of that consent. *Id.* The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness. *Id.* In addition to objective reasonableness, the scope of a consensual search is generally measured by the expressed object to be searched and the subject's-imposed limitation. *Id.* Therefore, the scope of a consent search is factually sensitive and does not depend solely on the express object to be searched. *Id.*

[31] Again, throughout the afternoon, the Wahls cooperated with the police in caring for the children inside their in-home daycare, they voluntarily discussed what had happened in the living room, and later Saundra agreed to participate in a video reenactment of the events in the basement. While a few items were moved during the reenactment, namely, the rocking chair and swing, Saundra helped the officers place those items in their original position as she narrated

the events. Furthermore, the record is devoid of any evidence establishing that Detective Finn's actions and statements were impermissibly coercive, thereby overcoming Saundra's will. *See Buckley*, 797 N.E.2d at 849. The record supports that Detective Finn was very polite with his questioning during the video reenactment. As a result, we conclude that Saundra voluntarily and knowingly consented to the search of her home which led to the video reenactment. Accordingly, we find that the Wahls' rights pursuant to the Fourth Amendment of the United States Constitution were not violated.

## 2. *Article 1, Section 11 of the Indiana Constitution*

Next, we address the Wahls' claim that law enforcement's conduct in performing the reenactment video without a warrant was unreasonable and therefore violated their rights pursuant to the Article 1, Section 11 of the Indiana Constitution, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

This language tracks the Fourth Amendment *verbatim*, however, the State of Indiana has adopted a different form of analysis for claims brought under Article I, Section 11. *See Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005). Under our state's constitution, the validity of a search by the government turns on an evaluation of the reasonableness of the officers' conduct under the totality

of the circumstances. *Id*. Thus, the unique protections provided in the Indiana Constitution require us to review all the facts and circumstances that are particular to this case. *Bell v. State,* 818 N.E.2d 481, 484 (Ind.Ct.App.2004).

[33]     In evaluating the totality of the circumstances, and thus the reasonableness of the search, we consider both the degree of intrusion into the subject's ordinary activities and the basis upon which the officer selected the subject of the search or seizure. *Litchfield*, 824 N.E.2d at 360. Thus, to determine the reasonableness of police conduct under the totality of the circumstances, we consider "(1) the degree of concern, suspicion, or knowledge that the person has violated the law; (2) the degree of intrusiveness that the search or arrest method imposes on the person; and (3) the extent of law enforcement needs." *State v. Harmon*, 846 N.E.2d 1056, 1058 (Ind. Ct. App. 2006).

[34]     Regarding the first factor, the officers' degree of concern, suspicion, or knowledge that a violation had occurred, in the instant case, this factor was essentially non-existent. As we noted above, the officers arrived at the Wahls' residence to assist with a report of an unconscious child. However, after A.D. was pronounced dead, the officers were justified in having a reasonably high degree of concern or suspicion that some sort of criminal activity might have occurred based on their observation of that the gate that had choked A.D. was faulty. As for the second factor, the degree of police intrusion on the Wahls' ordinary activities were not substantial. The Wahls had invited the police inside their home to help with the unconscious child, and they continued to cooperate with law enforcement for the remainder of the afternoon to reunite

the other children with their parents. After all the children had left, Saundra agreed to take part in the video reenactment. Further, we note that the video reenactment was limited to the basement, the area where the incident occurred. And finally, as to the third factor, we find that law enforcement needs were high. Detective Finn had good reason for investigating the events leading to A.D.'s death. Moreover, after Saundra consented to participating in the video enactment, there was no need to obtain a warrant.

[35] Saundra on behalf of Daniel, waived any and all of the Wahls' search rights since she agreed to submit to the video reenactment. Thus, given the reasonably high degree of suspicion of criminal activity, the minimally intrusive nature of police conduct prior to obtaining Saundra's consent, and the extent of law enforcement needs, the Wahls have failed to establish that the video reenactment, was unreasonable under Article I, Section 11 of the Indiana Constitution.

### C. *Custodial Interrogation*

[36] Saundra claims that when the video reenactment was taken, the taped interrogation was custodial in nature and she should have been advised of her rights under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

> In *Miranda* [] the United States Supreme Court held that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. These procedural safeguards include an advisement to the accused that

> he has the right to remain silent, that anything he says can be used against him, that he has the right to an attorney, and that if he cannot afford an attorney one will be appointed for him. However, these warnings are only required where a suspect is both in custody and subjected to interrogation.

*State v. Necessary*, 800 N.E.2d 667, 669-70 (Ind. Ct. App. 2003) (internal citation marks omitted). A law enforcement officer's duty to give *Miranda* warnings does not attach unless there has been such a restriction on a person's freedom as to render him in custody. *Loving v. State*, 647 N.E.2d 1123, 1125 (Ind. 1995).

[37] Saundra primarily relies on the presence of several officers in the house during the afternoon to support her claim that she was subject to a custodial interrogation. In particular, she contends that at the time the video was taped, there were no children inside her home, the police had taped off her home to keep everybody other than law enforcement from entering, and she had been surrounded by several officers who were "directing her course of action in recreating the scene of the accident." (Saundra's Br. p. 20). She adds that the police were also "not transparent" about their intentions and that the officers deceptively led her to believe that the video would only be used to assist the coroner in determining A.D.'s cause of death, and not for a criminal investigation. (Saundra's Br. p. 20). Thus, Saundra maintains that she was in custody at the time the video was taped, and she should have been advised of her *Miranda* rights.

[38] The question of whether a person is in custody for purposes of *Miranda* is a mixed question of fact and law. *State v. Ruiz*, 123 N.E.3d 675, 679 (Ind. 2019).

The test for whether a defendant is in custody is not whether a defendant feels free to go, but rather whether there was a "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *State v. Brown*, 70 N.E.3d 331, 336 (Ind. 2017) (citing *Stansbury v. California*, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)). Questioning an individual the police suspect of a crime does not inherently render the questioning custodial interrogation. *Reid v. State*, 113 N.E.3d 290, 300 (Ind. Ct. App. 2018), *trans. denied*. Courts look to the "totality of the circumstances" to determine whether a person was in custody. *Brown*, 70 N.E.3d at 336; *see also Hicks v. State*, 5 N.E.3d 424, 429 (Ind. Ct. App. 2014) ("We examine all the circumstances surrounding an interrogation and are concerned with objective circumstances, not with the subjective views of the interrogating officers or the suspect."), *trans. denied*.

[39] There is no question in this case that Detective Finn's questions during the video reenactment with Saundra constituted an interrogation. The dispositive issue here is whether Saundra was in custody at that time the video was taped. The record shows that law enforcement entered the Wahls' residence to respond to a 9-1-1 call of an unconscious child. At approximately 12:52 p.m., Detective Finn, arrived at the Wahls' residence and began questioning Daniel as to the daily procedures at the daycare. At 12:59 p.m., A.D. was pronounced dead. During Daniel's narration of the events that had occurred that day, Saundra emerged from the basement in hysterics and announced to Daniel that A.D. was dead. Detective Finn stopped questioning Daniel so that Daniel

could give Saundra some comfort. The record reveals that Saundra was emotional and distraught by A.D.'s death. Other officers continued to arrive at the Wahls' residence, some in uniform and others in street clothes. Following the pronouncement of A.D.'s death, the officers, in conjunction with the Wahls, spent the rest of their afternoon caring for the children and reuniting them with their parents at the canopy set up outside the Wahls' residence. The Wahls were not placed in handcuffs or attended by an officer who monitored their movements inside their home. It appears that at around 5:00 p.m., after all the children had presumably left the Wahls' residence, Detective Finn finally made a proper inquiry as to the events preceding A.D. being stuck in the gate. It was at this moment that Saundra was asked to participate in a video recording demonstrating the events.

[40] Despite spending his afternoon at the Wahls' residence, Detective Finn was unaware of the events leading to A.D.'s death. Without more definite information about the events, Detective Finn conducted "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process," which does not fall within the purview of *Miranda* requirements. *Miranda*, 384 U.S. at 477-78, 86 S.Ct. 1602. Further, while there were other officers present during the video reenactment, it appears that only one officer was conducting the questioning. *See Gauvin v. State,* 878 N.E.2d 515, 520-21 (Ind. Ct. App. 2007) (relying, in part, on fact that three officers conducted the interview to determine the suspect was in custody) (citations omitted).

[41] Based on the totality of the circumstances, we conclude that Saundra was not in custody and was not required to have been advised of her *Miranda* rights at the time she was asked to narrate the events which were captured in a video. Accordingly, we hold that the trial court did not abuse its discretion in admitting the video recording into evidence.

## II. *Sufficiency of the Evidence*

[42] The Wahls argue that the evidence is insufficient to sustain their conviction. When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id*. We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id*.

[43] The version of Indiana Code section 35-42-1-4(e) in effect at the time the Wahls committed their crimes provided that if: (1) a child care provider recklessly supervises a child; and (2) the child dies as a result of the child care provider's reckless supervision; the child care provider commits Class D felony involuntary manslaughter. Conduct is reckless if the person engaged in that conduct "in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." I.C. § 35-41-2-2(c). As charged, to convict the Wahls of

involuntary manslaughter, the State was required to prove that the Wahls recklessly supervised A.D. and that A.D. died as a result thereof.

[44] During her initial questioning, Saundra informed Detective Finn that she walked into the kitchen to feed another child who was seated in a highchair. After she fed the child in the highchair, she faced away from the toddler and infant room where A.D. was and began warming milk bottles. Once the bottles were warm, she picked up the child from the highchair and carried her on her hip along with a bottle and walked back into the toddler and infant room. Once she entered that room, Saundra saw A.D. face down, wedged at the neck between the basement baby gate and the wall.

[45] At trial, Detective Finn testified that when the white metal security gate was open, there was no line of sight from the kitchen. Detective Finn added that the white metal security gate did not latch correctly. In addition, Detective Hawkins, who arrived shortly after Detective Finn, observed that when the white metal security was "in the closed position[,] there was really . . . no lock locking it in" and when he "put a couple fingers on it," he "was able to push the gate open without any problem at all." (Tr. Vol. III, pp. 75-76). While Detective Hawkins was manipulating the gate, Daniel informed him that to mitigate that problem, the Wahls placed "some furniture on either side of the gate to try to keep the kids from pushing through it." (Tr. Vol. III, p. 76).

[46] In arguing that the evidence is insufficient to sustain his involuntary manslaughter conviction, Daniel attempts to detach himself from the events of

June 20, 2013, by solely passing the blame onto Saundra. Daniel distances himself from A.D.'s death by arguing that he "was not present at the time A.D. was fatally injured. He did not know how long A.D. had been left without supervision, [or] what activities A.D. or [Saundra] were engaged in." (Daniel's Br. p. 40). Thus, Daniel argues that the evidence presented allowed the jury only to infer that Saundra may have recklessly supervised A.D. and, "therefore, [he] cannot be held vicariously criminally liable for [Saundra's] actions." (Daniel's Br. p. 40). Daniel's attempt to distance himself from A.D.'s death must fail since he installed and maintained the security gate that trapped and killed A.D. In proving its case against Daniel, the State offered evidence that Daniel was aware that the gate did not latch properly. In fact, several months after the incident, Daniel informed Detective Finn that A.D. could "bulldoze through" that gate. (Tr. Vol. III, p. 125).

[47] As for Saundra, she contends that A.D.'s interaction with the gate was the proximate cause of his death. She equally distances herself from the events leading to A.D.'s death, and she claims that Daniel is to blame since Daniel was responsible for ensuring that the gate was installed properly and functioned well. Notwithstanding her contentions, at the second trial, Danny described his son as a healthy and happy baby. He testified that approximately a month or two prior to A.D.'s death, he was in the Wahls' kitchen either during drop off or pick up and he and Saundra were discussing A.D.'s progress. During the conversation, Saundra stated that A.D. was "able to push his way through the baby gate downstairs." (Tr. Vol. II, pp. 165-66).

[48] An act is reckless if it is undertaken in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct. *See* I.C. § 35-41-2-2 (2013). It is undisputed that the Wahls jointly owned and operated the daycare, they *recklessly* failed to ensure that the gate functioned properly, and they were aware that A.D. could push through the gate. While there were several metal security gates installed in the Wahls' residence, two months prior to A.D.'s death, Saundra informed A.D.'s father that A.D. could push open a baby gate that was in the basement. Daniel also informed Detective Hawkins that the gate did not latch properly and that to mitigate the problem, they used a rocking chair and swing on both sides of the gate to prevent the children from opening the gate. Based on the foregoing, we conclude that the State presented sufficient evidence beyond a reasonable doubt to sustain the Class D felony involuntary manslaughter convictions against the Wahls.

## III. *Restitution.*

[49] The Wahls argue that the evidence submitted at their sentencing hearing concerning the DiRienzos' loss was insufficient to support the trial court's restitution order of $22,353.72.

[50] The purpose of a restitution order is to impress upon the criminal defendant the magnitude of the loss he has caused and to defray costs to the victims caused by the offense. *Henderson v. State*, 848 N.E.2d 341, 346 (Ind. Ct. App. 2006). It is within the trial court's discretion to order restitution, and we will reverse only for an abuse of that discretion. *Id.* An abuse of discretion occurs if the trial

court's decision is clearly against the logic and effect of the facts and circumstances before it, or if the trial court misinterprets or misapplies the law. *Id.*

[51] Indiana Code section 35-50-5-3(a) provides that, in addition to any sentence imposed for a felony or misdemeanor, a court may order the payment of restitution to the victim of the crime. When such an order is entered, it must be based upon a consideration of:

> (1) property damages of the victim incurred as a result of the crime, based on the actual cost of repair (or replacement if repair is inappropriate);
>
> (2) medical and hospital costs incurred by the victim (before the date of sentencing) as a result of the crime;
>
> (3) the cost of medical laboratory tests to determine if the crime has caused the victim to contract a disease or other medical condition;
>
> (4) earnings lost by the victim (before the date of sentencing) as a result of the crime including earnings lost while the victim was hospitalized or participating in the investigation or trial of the crime; and
>
> (5) funeral, burial, or cremation costs incurred by the family or estate of a homicide victim as a result of the crime.

*Id.* A restitution order must reflect a loss sustained by the victim as a direct and immediate result of the defendant's criminal acts, and the trial court may

consider only expenses incurred by the victim prior to the date of sentencing. *Rich v. State*, 890 N.E.2d 44, 51 (Ind. Ct. App. 2008), *trans. denied*. "Evidence supporting a restitution order is sufficient 'if it affords a reasonable basis for estimating loss and does not subject the trier of fact to mere speculation or conjecture.'" *J.H. v. State*, 950 N.E.2d 731, 734 (Ind. Ct. App. 2011) (quoting *M.L. v. State*, 838 N.E.2d 525, 528 (Ind. Ct. App. 2005), *trans. denied*).

[52]	Ahead of the sentencing hearing, the State successfully filed a motion seeking judicial notice of A.D.'s father testimony, which was offered at the Wahls' first sentencing hearing. That transcript was admitted into evidence. Indiana Rule of Evidence 201 permits courts to take judicial notice of certain material, including facts "not subject to reasonable dispute" and facts "readily determined from sources whose accuracy cannot reasonably be questioned." For years, Rule 201 did not permit a trial court to take judicial notice of court records, even if they were "its own records in another case previously before the court on a related subject with related parties." *Gray v. State*, 871 N.E.2d 408, 413 (Ind. Ct. App. 2007) *trans. denied*. Effective January 1, 2010, amended Rule 201(b)(5) now permits courts to take judicial notice of "records of a court of this state," precisely as the trial court did here.

[53]	The Wahls complain that the trial court simply rubber-stamped the previous restitution amount without considering any evidence at all. Contrary to the Wahls' assertion, the trial court took judicial notice of Danny's sworn testimony, which he offered at the sentencing hearing. That portion of transcript was admitted into evidence. The transcript shows that in support of

the DiRienzos' restitution claim against the Wahls, A.D.'s father testified he was entitled to the reimbursement of daycare fees pertaining to A.D., his wife's therapy expenses, A.D.'s funeral expenses, and his lost wages, all amounting to $22,353.72.

[54] Although Danny did not again testify as to those amounts at the Wahls' second sentencing hearing, the trial court took judicial notice of Danny's prior sworn testimony as given at the Wahls' first sentencing hearing while reaching the restitution amount at the Wahls' second sentencing hearing. *See Rich*, 890 N.E.2d at 51 (holding that the trial court may consider only expenses incurred by the victim prior to the date of sentencing). As such, we hold that the restitution amount of $22,353.72 is supported by the evidence, and the trial court did not abuse its discretion in awarding that amount.

# CONCLUSION

[55] In light of the foregoing, we hold that the trial court did not abuse its discretion in excluding expert testimony, admitting the video reenactment, or issuing a restitution order. In addition, we hold that the State presented sufficient evidence beyond a reasonable doubt to sustain the Wahls' involuntary manslaughter conviction.

[56] Affirmed.

[57] Tavitas, J. concurs with separate opinion

[58] Mathias, J. dissents with separate opinion

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Daniel Wahl and Saundra Wahl, *Appellants-Defendants,* | Court of Appeals Case No. 19A-CR-2258 |
| v. | |
| State of Indiana, *Appellee-Plaintiff.* | |

**Tavitas, Judge concurring**

[59] I respectfully concur, but I write separately to emphasize relevant statutory provisions, which I believe further support the conclusion that *Miranda* warnings were not required prior to Saundra's participation in the video reenactment. Indiana Code Section 36-2-14-6[1] provides:

> Whenever the coroner is notified that a person in the county:

---

[1] The cited version of Indiana Code Section 36-2-14-6 was in effect in 2013 when the investigation occurred. The language of the current version differs slightly.

> (1) has died from violence;
>
> (2) has died by casualty;
>
> (3) has died when apparently in good health;
>
> (4) has died in an apparently suspicious, unusual, or unnatural manner; or
>
> (5) has been found dead;
>
> the coroner shall, before the scene of the death is disturbed, notify a law enforcement agency having jurisdiction in that area. *The agency shall assist the coroner in conducting an investigation of how the person died and a medical investigation of the cause of death.* The coroner may hold the remains of the decedent until the investigation of how the person died and the medical investigation of the cause of death are concluded.

(emphasis added). The specific facts of this case demonstrate that the detectives were fulfilling their duty to assist the coroner in his investigation, and Saundra was not subjected to a custodial interrogation.[2]

[60] Law enforcement was dispatched to the Wahls' daycare business on June 20, 2013. When the first officer arrived at 12:23 p.m. after the Wahls called 911, the officer's primary focus was saving A.D.'s life. The officers subsequently turned their attention to gathering the other children's belongings and

---

[2] As the majority notes, we need only consider if Saundra is in custody.

contacting parents to ensure the other children's safety. This process took the "bulk of the afternoon[.]" Tr. Vol. III p. 16.

[61] After the children were removed from the Wahls' daycare, detectives were able to investigate the cause of A.D.'s death. Detectives advised Saundra that the purpose of the video reenactment was to assist the coroner in determining the cause and manner of death. The coroner and the coroner's aide were also present. Detective Hawkins operated the video camera while Detective Finn narrated and asked questions regarding the reenactment.

[62] As Detective Hawkins explained, the doll reenactment is "standard procedure" following infant and child deaths. *Id.* at 34. The coroner's office "expect[s]" law enforcement to "have that documentation to help them out." *Id.* Similarly, Detective Finn testified that a doll reenactment was "best practice" in any child or infant death case to assist the coroner's office. *Id.* at 112. At the end of the video reenactment, Detective Finn told Saundra that Saundra needed to place the doll where A.D. was found in order for detectives to take a photograph for the coroner's office. *See* State's Ex. 45. The coroner used the doll reenactment in making findings with regard to A.D.'s death.

[63] While the detectives did not tell Saundra that she was free to leave or free to ask the detectives to leave, Detective Finn communicated the Wahls were "not under arrest or otherwise detained." Tr. Vol. III p. 23. At no point did the Wahls object to law enforcement's presence in the house. The Wahls were cooperative and free to move about the home throughout the day. Moreover,

as can be seen in the video, when Saundra became upset recalling the day's events, she was permitted to walk away to calm down. *See* State's Ex. 45. When detectives left the Wahls' home on June 20, 2013, detectives did not consider the Wahls to be "suspects of criminal activity."[3] Tr. Vol. III p. 131.

[64] As evidenced by the above facts, law enforcement was conducting a general on-scene investigation pursuant to Indiana Code Section's 36-2-14-6's mandate that law enforcement "shall assist the coroner", and Saundra was not in custody. Thus, the warnings described in *Miranda* were unnecessary prior to the reenactment video, as *Miranda* does not affect "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process[.]" *See Miranda,* 384 U.S. at 477, 86 S. Ct. at 1629.

[65] Indiana law follows *Miranda*'s directive that these warnings are not required prior to general on-the-scene questioning or general fact investigations. *See Bishop v. State,* 700 N.E.2d 473, 476 (Ind. Ct. App. 1998) (declining to find Bishop was in custody during general on-the-scene questioning "in a noncoercive atmosphere"); *Lucas v. State,* 413 N.E.2d 578 (Ind. 1980) (declining to find custodial interrogation occurred during questioning regarding an

___

[3] Suspecting an individual of committing a crime is not determinative in deciding whether that individual is in custody. *See Reid v. State,* 113 N.E.3d 290 (Ind. Ct. App. 2018) ("Questioning an individual the police suspect of a crime does not inherently render the questioning custodial interrogation."). Nonetheless, this fact is further evidence that law enforcement was functioning as an investigator for the coroner during the reenactment video.

automobile accident prior to law enforcement's discovery that a crime had been committed); *Dillon v. State,* 275 N.E.2d 312 (Ind. 1971) (declining to find custodial interrogation occurred when police were "merely investigating a possible crime" (internal quotations omitted)); *Wissman v. State,* 540 N.E.2d 1209, 1212 (Ind. 1989) (declining to find custodial interrogation occurred when officers asked Wissman what happened while he was lying on the floor, injured, and unable to move, because it was "for information, not a question used to elicit a confession").

[66]   The events on June 20, 2013, were tragic, and there is no positive outcome here.  Nonetheless, I am compelled to conclude law enforcement was conducting a general on-the-scene investigation to assist the coroner, and Saundra was not subjected to a custodial interrogation during the reenactment video.  As such, I concur.

| | |
|---|---|
| Daniel Wahl and Saundra Wahl, <br> *Appellants-Defendants,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | Court of Appeals Case No. <br> 19A-CR-2258 |

**Mathias, J., dissenting**

Because I believe that the admission of the video reenactment violated Saundra's *Miranda* rights, I respectfully dissent.

As correctly noted by the majority, an officer is required to give *Miranda* warnings only when a defendant is both (1) in custody and (2) subject to interrogation. *Furnish v. State*, 779 N.E.2d 576, 578–79 (Ind. Ct. App. 2002), *trans. denied*. I agree with the majority that Detective Finn's questions during the video reenactment constituted interrogation. *See* Slip op. at 21 ("There is no question in this case that Detective Finn's questions during the video reenactment with Saundra constituted an interrogation."). Accordingly, the

only issue on which I differ from the majority is whether Saundra was in custody for purposes of *Miranda*. The majority concludes that she was not; I believe that she was.

[69] As our supreme court stated in *State v. Ruiz*, 123 N.E.3d 675, 680 (Ind. 2019):

> Under *Miranda*, freedom of movement is curtailed when a reasonable person would feel not free to terminate the interrogation and leave. This freedom-of-movement inquiry requires a court to examine the totality of objective circumstances surrounding the interrogation—such as the location, duration, and character of the questioning; statements made during the questioning; the number of law-enforcement officers present; the extent of police control over the environment; the degree of physical restraint; and how the interview begins and ends.

*State v. Ruiz*, 123 N.E.3d 675, 680 (Ind. 2019) (citing *Howes v. Fields*, 565 U.S. 499, 509 (2012)).[4] We have also identified a similar list of factors as significant in determining whether a person is in custody, including: whether and to what extent the person has been made aware that he is free to refrain from answering questions; whether there has been prolonged coercive, and accusatory questioning, or whether police have employed subterfuge in order to induce self-incrimination; the degree of police control over the environment in which

---

[4] The majority cites *State v. Brown*, 70 N.E.3d 331, 336 (Ind. 2017), which stated that "[t]he test of whether a defendant is in custody is **not whether a defendant feels free to go**, but rather whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (emphasis added, internal quotation marks omitted) (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994)). However, in *Ruiz*, our supreme court held that "freedom of movement is curtailed when a reasonable person **would feel not free to terminate the interrogation and leave**.") (emphasis added) (citing *Howes*, 565 U.S. at 509). To the extent there is any conflict between these two statements, I follow the more recent case.

the interrogation takes place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed; and whether the suspect could reasonably believe that he has the right to interrupt prolonged questioning by leaving the scene. *Gauvin v. State*, 878 N.E.2d 515, 521 (Ind. Ct. App. 2007) (quoting *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996)).

[70]     I believe that the totality of the circumstances in the present case demonstrates that Saundra was in custody, i.e., her freedom of action was deprived in a significant way such that a reasonable person in her position would not have felt free to end the interrogation and leave. There was no indication that the police ever informed Saundra that she was free to not answer questions. And although Saundra called 911, thereby seeking the aid of the police, the police remained in the house for several hours after A.D. was taken to the hospital and after all of the other children were removed from the house. The police even told Saundra that they wanted her to recreate the scene of A.D.'s tragic death in order to help the police assist the coroner. But this was objectively not the only, or even the primary, purpose of the reenactment. Instead, the police were encouraging Saundra to incriminate herself. And even though the questioning took place in the Wahls's home, the police had a large degree of control over the environment: the police had taped off the house to keep others out, and there were multiple police officers in the home. Indeed, the police collected evidence from the scene. The police also directed Saundra as she reenacted the

events that led to A.D.'s death. In other words, the police were in control of the scene, not Saundra.

[71]     Under the totality of these facts and circumstances, I believe that Saundra's freedom of action and movement were deprived in a significant way, i.e., she was in custody for purposes of *Miranda*. Because Saundra was subject to custodial interrogation, the police were required to advise her of her *Miranda* rights. The failure to so advise Saundra of her *Miranda* rights means that the trial court should have excluded the video reenactment from evidence, and I respectfully dissent from the majority's conclusion otherwise.